AMERICAN MOTORS CORPORATION, Petitioner-Appellant-
Petitioner,

v.

DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS,
Respondent.

Supreme Court

*No. 77–703.   Argued November 24, 1980.—Decided April 29, 1981.*

(Also reported in 305 N.W.2d 62.)

338

For the petitioner there were briefs by *Herbert P. Wiedemann, Thomas L. Shriner, Jr., Michael I. Paulson* and *Foley & Lardner* of Milwaukee, and oral argument by *Michael I. Paulson.*

For the respondent the cause was argued by *David C. Rice,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

Amicus curiae brief was filed by *LeRoy D. Clark,* general counsel, *Joseph T. Eddins,* associate general counsel, *Lutz Alexander Prager, W. Sherman Rogers,* attorneys, for Equal Employment Opportunity Commission of Washington, D. C., and *Kathleen Mulligan,* of Milwaukee, local counsel, for United States Equal Employment Opportunity Commission.

HEFFERNAN, J. This is a review of a decision[1] of the court of appeals which affirmed a judgment of the circuit court for Dane county sustaining an order of the Department of Industry, Labor and Human Relations (hereinafter DILHR). DILHR's order directed that the respondent, American Motors Corporation, cease and desist from discharging employees on the basis of religion. The order also provided that American Motors pay the complainant, Thomas L. Bartell, back wages for the period he was unemployed following his discharge by American Motors. The validity of the portion of the order concerned with back wages is not at issue on this review.[2]

---

[1] *American Motors Corp. v. ILHR Dept.,* 93 Wis.2d 14, 286 N.W. 2d 847 (Ct. App. 1979).

[2] DILHR ordered the payment of back pay. The circuit court held that order beyond DILHR's authority. The court of appeals reversed that portion of the circuit court's judgment. In view of our disposition of the case, back pay is not an issue to be considered, nor have the parties sought further review on this issue.

The basic question on this review is whether the Wisconsin Fair Employment Act, secs. 111.31 to 111.37, Stats., requires an employer to accommodate an employee's work absences which are occasioned by the employee's observance of religious holidays or days of religious obligation. DILHR, the circuit court, and the court of appeals held that accommodation was required. This court concludes that the Wisconsin Fair Employment Act does not impose that duty upon an employer, and we therefore reverse.

The undisputed facts show that Bartell applied for employment with American Motors in May of 1972. Although he stated on his employment application that he had received a bachelor's degree in engineering, his degree requirements were not fully completed even at the time of his discharge from the company. Nevertheless, he was hired as an engineer for a management position which required him to participate in a six-month training program commencing on July 7, 1972. The training program consisted of a rotating schedule by which each management trainee was assigned to various departments within the American Motors plant, so he could observe and understand the manufacturing operations. Because this entailed some reallocation and disruption of the work in the operating departments of the American Motors plant, the schedule was rigidly planned to avoid having more than one trainee in any department at the same time.

At an orientation meeting prior to the start of the management training program, American Motor's personnel manager explained the program and distributed the scheduled assignments to each of the trainees. He explained the company's policies, including those concerning holidays, vacations, and leaves of absence. Although trainees were encouraged to ask any questions, Bartell did not, at that time, point out the conflict be-

tween his assigned training schedule and his religious commitments. Bartell acknowledged that he did not inform American Motors of possible religious conflicts with his work schedule, because he thought he would not be hired if he mentioned it.

Bartell had been baptized as a member of the Worldwide Church of God on January 8, 1972. He acknowledged that, at the time he was hired, he knew that members of that faith were required to abstain from secular work from sundown Friday to sundown Saturday of each week and on certain days, which were determined on the basis of biblical texts and were fixed in accordance with the Jewish calendar. In 1972, one such holy day, the Day of Atonement, fell on September 18, a Monday. Another, the Feast of Tabernacles, consisted of an obligatory eight-day religious convocation lasting from Friday, September 22, to Friday, September 29. During the Feast of Tabernacles, members of the Worldwide Church of God were required to abstain from secular work on the first and last days and to attend a regional church convocation for the entire week.

Bartell said he did not raise any question about days off for religious observances at the time of the orientation briefing, when vacations and leaves of absence were discussed, because he considered it a personal matter he did not want to discuss in the presence of other employees. He testified that he intended to speak to the personnel manager in private, but no opportunities for private conversation arose until August 7. On that date, he asked the personnel manager whether he could be excused from work on the Day of Atonement, Monday, September 18, and on the week days during the Feast of Tabernacles. The personnel manager said that he would confer with whomever was necessary in respect to this request, although he did not think American Motors could give Bartell the time off for this purpose.

At the original conference with the personnel manager, Bartell did not explain that his religious observances were mandatory; and it was only at a later date, apparently on August 10, that he told the personnel manager that his religion obligated him not to work on the holy days. After further conferring with company officials, the personnel manager told Bartell on August 17 that his request was denied and that he would either have to work on the days he requested to have off or to be terminated from employment. The personnel manager suggested that Bartell think the matter over and make his decision the following day. On August 18, Bartell told the personnel manager that he could not change his request. He was then informed that he was terminated from employment with American Motors on that date.

Initially, on August 24, 1972, Bartell filed a complaint with the Federal Equal Employment Opportunity Commission (hereinafter EEOC), alleging that his discharge was based upon religious discrimination. The federal complaint was referred to the Wisconsin department of industry, labor and human relations. In the letter of referral to the Wisconsin department, the regional director of EEOC stated:

"Pursuant to Section 706(c) of the Act [Civil Rights Act of 1964] no charge may be filed with this Commission under Section 706(b) until the expiration of 60 days after proceedings have been commenced under the fair employment practice law of your State . . ."[3]

Although Bartell on March 1, 1973, requested DILHR to withdraw his complaint, nevertheless DILHR, proceeding under the provisions of sec. 111.36, Stats., made

---

[3] This procedure followed the federal requirement. *See* 42 U.S.C. sec. 2000e–5(c) (Supp. II, 1972); 29 C.F.R. sec. 16.01.12(b)(1)(iii), (iv) (1972). Considerably later—on November 26, 1974—the EEOC made a determination of reasonable cause, and invited conciliation under federal law. This, however, is the only evidence of record indicating further proceedings in this matter by EEOC.

a finding of probable cause that discrimination had occurred, and attempted conciliation, which was unsuccessful. A hearing on the complaint was held. DILHR issued its final decision and order on January 13, 1977, determining that American Motors had violated the Wisconsin Fair Employment Act in discharging Bartell. American Motors was ordered to cease and desist from religious discrimination against its *employees* and to pay back wages from the date of discharge until Bartell found other employment.

American Motors commenced an action under ch. 227, Stats., to review these administrative findings. The circuit court undertook an extensive review of DILHR's findings of fact and conclusions of law. The circuit court's opinion discussed American Motors' contention that the claimant Bartell was not terminated for his insistence on observing the holy days, but for his deception in failing to disclose the conflict between the work schedule and his religious obligations at an earlier time.

Judge Bardwell, the circuit judge, pointed out that the record indeed contained evidence to support American Motors' contention that Bartell's deception, and not his adherence to religious practices, was the reason for the firing. Nevertheless, there was also evidence—that submitted by Bartell—that he was terminated for his insistence on observing his religious holy days. In sustaining the findings of fact of DILHR, Judge Bardwell pointed out that each contention was worthy of belief, but the factual determination under those circumstances was for DILHR to make and would not be disturbed by the court. There is also evidence in the record that it was the policy and the usual practice for American Motors to permit sincere believers to abstain from work on obligatory holy days. Accordingly, Judge Bardwell sustained the findings of fact and conclusions of law, but modified the judgment to provide that DILHR's order be limited in its applicability to only the com-

plainant, Thomas Bartell. The record in this case clearly would not warrant a conclusion that American Motors, as a matter of policy, disregarded the religious needs of its employees. The order of DILHR that American Motors "cease and desist from discharging employees on the basis of religion" was unjustified and unsupported by the record. The circuit court also eliminated the award of back pay. The judgment of the circuit court was appealed to the court of appeals. The circuit court judgment was affirmed, but the order for back pay was reinstated.

The court of appeals concluded that American Motors had a duty under the Wisconsin Fair Employment Act to accommodate Bartell's religious needs and that the evidence was sufficient to support DILHR's finding that American Motors failed to afford a reasonable accommodation to Bartell. The court of appeals further concluded that the duty of reasonable accommodation under the Wisconsin Fair Employment Act did not violate the establishment clause of the First Amendment to the United States Constitution or Art. I, sec. 18, of the Wisconsin Constitution.

On petition to this court to review the decision of the court of appeals, only two questions were raised: Whether American Motors had a duty, under the Wisconsin statutes, of reasonable accommodation and, if so, the extent of that duty, and whether the imposition of that duty violated constitutional provisions.[4] Because

[4] Contrary to the formulation of the issue proposed by the dissenting opinion, which in large measure views this case as raising a question of differential treatment of religions by the same employer—discrimination—the parties throughout this litigation viewed, argued, and briefed this case as involving the question of the duty of reasonable accommodation. We accepted this case only to decide the important question whether the Wisconsin Fair Employment Act imposes such a duty and, if so, whether constitutional difficulties are thereby created. We would not have

we conclude that there exists no duty under the Wisconsin statutes to accommodate the religious practices of Thomas Bartell, we have no occasion to reach the constitutional question.

The basic rationale of the court of appeals in finding that there is a duty to accommodate is that the Wisconsin Fair Employment Act of 1945 addresses the same problems of discrimination which are addressed in the Federal Civil Rights Act of 1964 and its amendments. Because the United States Supreme Court has held that Title VII of the Federal Civil Rights Act, as amended, requires accommodation to an employee's religious practices and because some state courts, in interpreting their own statutes or constitutions which are designed to protect civil rights have interpreted those state provisions to require accommodation, the court of appeals concluded that it is reasonable to hold that the Wisconsin Fair Employment Act should also be interpreted the same. It also placed "considerable weight" on the administrative interpretations of DILHR that accommodation is required by the Wisconsin law.

To appreciate the error in this position, it is necessary to review the legislative history of the Wisconsin Fair Employment Act; and it should be emphasized at the outset that the Wisconsin act, unlike the Federal Civil

accepted review if the issue in the case were a question of religious discrimination; that question does not raise any matters of sufficient importance to justify review beyond the court of appeals, because the statutory prohibition against religious discrimination is well established. Had that been the issue, Bartell's rights were appropriately vindicated in the court of appeals and the case would not have been taken on review. The entire posture of the case demonstrates beyond doubt that the active litigants, DILHR and American Motors, sought a definitive statement on the duty to accommodate. As the dissent acknowledges, Bartell "is no longer really interested in the case." The discrimination issue, per se, is irrelevant to the purpose for which we accepted review.

Rights Act, as amended in 1972, contains no legislative requirement of accommodation. The portions of the Fair Employment Act relevant to the issue in this case are set forth in secs. 111.31(1), (2), (3) and 111.32(5) (a), Stats. 1971.[5]

[5] "111.31 **Declaration of policy.** (1) The practice of denying employment and other opportunities to, and discriminating against, properly qualified persons by reason of their age, race, creed, color, handicap, sex, national origin or ancestry, is likely to foment domestic strife and unrest, and substantially and adversely affect the general welfare of a state by depriving it of the fullest utilization of its capacities for production. The denial by some employers, licensing agencies and labor unions of employment opportunities to such persons solely because of their age, race, creed, color, handicap, sex, national origin or ancestry, and discrimination against them in employment, tends to deprive the victims of the earnings which are necessary to maintain a just and decent standard of living, thereby committing grave injury to them.

"(2) It is believed by many students of the problem that protection by law of the rights of all people to obtain gainful employment, and other privileges free from discrimination because of age, race, creed, color, handicap, sex, national origin or ancestry, would remove certain recognized sources of strife and unrest, and encourage the full utilization of the productive resources of the state to the benefit of the state, the family and to all the people of the state.

"(3) In the interpretation and application of this subchapter, and otherwise, it is declared to be the public policy of the state to encourage and foster to the fullest extent practicable the employment of all properly qualified persons regardless of their age, race, creed, color, handicap, sex, national origin or ancestry. This subchapter shall be liberally construed for the accomplishment of this purpose.

"111.32 **Definitions.** When used in this subchapter:

". . .

"(5) (a) 'Discrimination' means discrimination because of age, race, color, handicap, sex, creed, national origin or ancestry, by an employer or licensing agency individually or in concert with others, against any employe or any applicant for employment or licensing, in regard to his hire, tenure or term, condition or privilege of employment or licensing and by any labor organization against any member or applicant for membership, and also in-

The Fair Employment Act, as it appears today in the statutes, prohibits nine enumerated types of employment discrimination: Discrimination based on age, race, creed, color, handicap, sex, national origin, ancestry, and arrest record or conviction record. These types of discrimination are enumerated in secs. 111.31 (1) and 111.32 (5), Stats. In addition, sec. 111.31 (4) and other parts of the subchapter limit the permissible use of "honesty" tests to be given to employees or prospective employees. Of these nine categories, five—race, color, creed, national origin, and ancestry—were identified as creating problems of discrimination by the original enactment of the Fair Employment Act. Ch. 490, Laws of 1945. None of these five categories have ever been elaborated upon or further defined by the legislature in the course of numerous amendments to the act. By contrast, the four remaining categories—age, sex, handicap, and arrest record—were all added over the years following 1945;[6] and the act now fully and clearly defines what constitutes discrimination in each of these problem areas.

It is the alleged discrimination against Bartell because of "creed" which is relevant to this decision. Although the legislature has never defined the meaning of "creed," this court has concluded in *Augustine v. Anti-Defamation League of B'nai B'rith*, 75 Wis.2d 207, 215, 249 N.W.2d 547 (1977), that "creed" refers to a "system

---

cludes discrimination on any of said grounds in the fields of housing, recreation, education, health and social welfare as related to a condition or privilege of employment."

[6] Age: Ch. 149, Laws of 1959; ch. 687, Laws of 1959.

Sex: Ch. 529, Laws of 1961; ch. 628, Laws of 1961; ch. 234, Laws of 1967; ch. 94, secs. 59–61, Laws of 1975; ch. 286, secs. 2–4, Laws of 1977.

Handicap: Ch. 230, Laws of 1965; ch. 275, sec. 18, Laws of 1975.

Arrest or conviction record: Ch. 125, Laws of 1977.

The honesty-testing provisions—which are also quite detailed —were added by ch. 319, Laws of 1979.

of religious beliefs." Despite the fact that discrimination as to creed is one of the five original areas of discrimination listed in the act of 1945, the legislature has not found it necessary to provide further guidance in respect to an employer's obligation where arguably there is a conflict between an employee's religious practices and the employer's personnel and management procedures. Nor has there been any judicial interpretation beyond that given in *Augustine.*

It is clear, and it is acknowledged by all of the parties to this review, that nowhere in the act itself is there an express requirement that an employer be required to accommodate its business conduct to the employee's religious observances. Insofar as the Wisconsin legislature is concerned, there is no evidence whatsoever of attention to the problems of religious discrimination between the original passage of the act in 1945 and 1981. Where there is so little evidence of subsequent legislative interest or attention, there is little upon which a court can determine intent on the basis of post-passage legislative treatment of the original statute.

The legislature has never acted explicitly to require an employer to accommodate an employee's religious observances. What little evidence may be gleaned from the legislative history is to the contrary and would lead to the conclusion that the legislature has rebuffed efforts to incorporate the accommodation provisions of the Federal Civil Rights Act into the Wisconsin Fair Employment Act.

In 1975, Assembly Bill 485 was introduced as an amendment to the Fair Employment Act. In part, it would have amended the act:

"To provide for implementation within this state of the fair employment policies embodied in the federal civil rights act of 1964."

At the time this bill was introduced into the Wisconsin legislature, the Federal Civil Rights Act of 1964 had been amended by congressional action in 1972 to expressly require that employers accommodate their employees' religious practices. Had this amendment been incorporated into the Wisconsin Fair Employment Act, it—arguably at least—would have incorporated the accommodation policy of the federal act. This bill, however, failed of passage and died in committee. We do not believe, however, it would be logical or reasonable to assert that the failure of this bill to be enacted constitutes a legislative rejection of the duty to accommodate. Bills frequently fail to attain the stature of laws for reasons that have nothing to do with their merit, but are more related to the time exigencies and other priorities with which the legislature is confronted. The most that could be gleaned from this legislative episode is that the legislature, when it had the opportunity to incorporate an accommodation provision into the Wisconsin act, did not do so.[7]

In summary, then, of the expressed legislative intent, the most that can be said is that the legislature has never stated that there is a duty on the part of an employer to accommodate an employee's religious practices.

---

[7] Similarly inconclusive is the history of Assembly Bill 1094 (1971). That bill *inter alia* would have redefined discrimination as "differential treatment between persons or between classes of persons" on the basis of enumerated grounds, including religion, unless related to merit. Because this definition is somewhat broader than the original and existing one, passage of the bill might have constituted evidence of a legislative intent to impose a duty of accommodation. However, the defeat of the bill, which died in committee, does not lead to the contrary inference of legislative disapproval, because the bill contained numerous other provisions which might equally well explain its non-passage.

In fact, religious practices, as such, are unmentioned in the legislation. Nevertheless, in sub. (3) of sec. 111.31, Stats., the legislature stated:

". . . it is declared to be the public policy of the state to encourage and foster to the fullest extent practicable the employment of all properly qualified persons regardless of their age, race, creed, color, handicap, sex, national origin or ancestry. This subchapter shall be liberally construed for the accomplishment of this purpose."

The court of appeals recites this legislative direction of liberal construction but does not point out why, by liberally construing the provisions which are expressly set forth in the act, a court has the authority to import into the act specific provisions that the legislature omitted. Apparently, the reasoning of the court of appeals is that it is appropriate to import into the act all mechanisms which are not inconsistent with the purpose and spirit of anti-discrimination legislation. We believe this goes beyond the parameters of liberal construction. This court has said in *Lukaszewicz v. Concrete Research, Inc.*, 43 Wis.2d 335, 342, 168 N.W.2d 581 (1969):

"We cannot, of course, by a liberal construction change the wording of a statute to mean something which was not intended by the legislature or by the plain language used."

We have also said in *Augustine, supra* at 215, quoting *Shuchter v. Division of Civil Rights*, 117 N.J. Super 405, at 408, 285 A.2d 42 (1971):

" 'We do not believe, however, that it is our function as a reviewing court to expand a legislative enactment because of new trends in the definition of a word. Whether discrimination on the basis of moral, philosophical, social or political values should be condemned or permitted among the citizens of this state is a question most properly answerable by the legislature.' "

We cannot conclude that the use of the undefined term, "creed," permits us to supplant or supplement the legislature's prerogative of determining by what means discrimination in respect to creed or religion should be suppressed or eliminated. This is a legislative function.

By liberal construction all that is meant is that the terms actually used by the legislature shall be given the fullest application within proper definitional guidelines that are consistent with the spirit of the legislation. This is precisely what *Augustine, supra,* did. It gave a liberal construction to the word, "creed," but only within the appropriate definitions of the very word used by the legislature. Liberal construction does not give a court the right to expand the terms of the legislation. The term, "accommodation," that is, the duty of an employer to reasonably adopt his business practices to the religious needs of an employee, is not hinted at in the Wisconsin Fair Employment Act. We do not in any way intimate that accommodation should not appropriately, or could not constitutionally, be adopted by legislative enactment. All we conclude is that the legislature in the State of Wisconsin has not yet seen fit to establish such public policy and it is not appropriate for this court, even though it may favor accommodation of religious beliefs, to usurp the prerogatives of the legislature and create legislation where none exists.

Although the legislature has not expressly provided for accommodation in the Fair Employment Act, it may have the opportunity to do so in the current session of the legislature. The files of the legislative reference bureau show the introduction on March 18, 1981, of Senate Bill 204 sponsored by numerous members of the senate and of the assembly. Among the changes proposed in the Wisconsin Fair Employment Act by that bill is the creation of sec. 111.337(1). The proposed amendment provides:

"In addition to the actions prohibited under s. 111.322 [a new subsection added by the proposed bill], it is employment discrimination because of creed to refuse to reasonably accommodate an employe's or prospective employe's religious observance or practice without undue hardship on the part of the employer, unless the employer demonstrates that he or she is unable to so accommodate."

The introduction of this bill and its language is significant in the context of the present case, because it contemplates that the failure to accommodate is an *additional* type of employment discrimination not covered in the original statute. Thus, insofar as legislative intent is concerned, the framers of this bill are of the opinion that the question of the duty to accommodate is being submitted to the legislature for consideration for the first time. We note, however, the comments in the analysis of Senate Bill 204 by the legislative reference bureau. In discussing the bill generally, it states:

"It places into the subchapter the following concepts which are presently the law in this state either because of Wisconsin supreme court decisions or federal laws:
". . .
"(E) An employer must attempt to make certain reasonable accommodations to the . . . religious observances or practices of employes and prospective employes."

We believe this analysis to be incorrect insofar as it applies to the duty of accommodation. No Wisconsin supreme court decision has found the duty to accommodate under state law. The court of appeals has done so, but only in the very case which is being reviewed herein. Moreover, the bill analysis' apparent reliance on federal laws as establishing the law of this state in this context is inappropriate. While it is true that this court ordinarily has the duty to enforce federal causes of action (*see Terry v. Kolski*, 78 Wis.2d 475, 254 N.W.2d 704

(1977)), that is not true in respect to the Federal Civil Rights Act. The relationship between the Federal Civil Rights Act and the state Fair Employment Act shows that the remedies under each jurisdiction are to be pursued separately. As the statement of the procedural posture of this case demonstrates, Bartell initially sought his remedy in the office of the EEOC. The matter was referred to DILHR by the EEOC for proceedings "under the fair employment practice *law of your State.*" (Emphasis supplied.) When, as a matter of comity pursuant to federal law, EEOC defers to state action, it is not the federal law which is enforced by state action, but the law of the state itself. There is no *ipso facto* incorporation of the Federal Civil Rights Act in the Fair Employment Act of the State of Wisconsin. Accordingly, the fact that the Civil Rights Act of 1964, as amended in 1972, requires accommodation does not import those provisions into state law enacted in 1945, absent some appropriate action by the State of Wisconsin to incorporate that provision of the federal law. If the analysis of the legislative reference bureau was intended to mean that federal laws are automatically incorporated into the state law, it is incorrect.

Nevertheless, it is possible by a course of administrative interpretation to modify or supplement statutory provisions adopted by the Wisconsin legislature; and under proper circumstances, this court will give weight to such an administrative construction of a statute. This may be so even though, as we have often stated, upon review of actions of administrative agencies, questions of law such as statutory construction are reviewable *ab initio* by this court (*see Jaeger Baking Co. v. Kretschmann,* 96 Wis.2d 590, 594, 292 N.W.2d 622 (1980); *Boynton Cab Co. v. ILHR Dept.,* 96 Wis.2d 396, 405, 291 N.W.2d 850 (1980)) and properly subject to judicial sub-

stitution of judgment (*Dept. of Revenue v. Milwaukee Refining Corp.*, 80 Wis.2d 44, 48, 257 N.W.2d 855 (1977)). The position of DILHR is that its construction of the Fair Employment Act to include an accommodation requirement is entitled to such weight in the present case. The record, however, does not support any finding which would enable us to conclude that DILHR has taken any steps that would incorporate the accommodation provisions of the Federal Civil Rights Act into Wisconsin law.

One method of so doing would be the promulgation of administrative rules. As a part of the enactment of the Fair Employment Act, DILHR was given authority to "make, amend and rescind such rules as are necessary to carry out this subchapter." Sec. 111.33, Stats. This authority was initially granted by ch. 490 of the Laws of 1945. The exercise of such rule-making function, however, is subject to the strictures of ch. 227, the Administrative Procedures Act. No administrative rule has ever been promulgated to require a duty of accommodation.[8] Had the duty to accommodate been incorporated in a

---

[8] The administrative rules governing Wisconsin Fair Employment Act are to be found in 7 Adm. Code, Ch. Ind. 88, pp. 29–33. A number of rules have been promulgated, but although the federal statute was given an administrative gloss by the EEOC in 1966 and 1967 in respect to accommodation and by congressional amendment in 1972, no effort was made by DILHR by administrative rule to broaden the scope of the statute or to keep pace with federal law. While the rules define "discrimination," they do so in the words of the statute and do not refer to accommodation. 7 Adm. Code Ch. Ind. 88.01. Specifically, moreover, no effort, discernible in the legislative or administrative history, reveals that DILHR ever assumed the duty imposed by the legislature in sec. 111.35(6), Stats., to:

"Transmit to the legislature from time to time recommendations for any legislation which may be deemed desirable in the light of the department's findings as to the existence, character and causes of any discrimination."

rule, it would, of course, have been subject to the legislature's oversight of an agency's rule-making power; and had such a rule been promulgated and not been suspended or set aside on legislative review pursuant to sec. 13.56, Stats., the rule would be some evidence that the legislature had acquiesced in DILHR's interpretation of the statute. No rule was promulgated.

In light of the sweep of the policy of accommodation and the language of sec. 227.01(3) and (4), Stats. 1971,[9] we believe that the exercise of the rule-making power by DILHR would have been the most appropriate method of requiring accommodation. However, this court recognizes, in a proper case, the administrative construction which an agency places upon a statute by its own decisional processes other than administrative rule making.[10]

DILHR asserts that it uniformly interprets and administers the statute to require accommodation. It asserts that its interpretation has twice been accorded judicial approval. We find those judicial approvals insufficient to be precedent, because both appear in circuit court opinions subsequent to the complaint in this case, and one of them is the opinion of Judge Bardwell which is the subject of this very appeal.

---

[9] "(3) 'Rule' means a regulation, standard, statement of policy or general order (including the amendment or repeal of any of the foregoing), of general application and having the effect of law, issued by an agency to implement, interpret or make specific legislation enforced or administered by such agency or to govern the organization or procedure of such agency.

"(4) Every statement of general policy and every interpretation of a statute specifically adopted by an agency to govern its enforcement or administration of legislation shall be issued by it and filed as a rule. . . ."

[10] See *Wisconsin Telephone Co. v. ILHR Dept.*, 68 Wis.2d 345, 228 N.W.2d 649 (1975), for a discussion of an administrative agency's authority to announce general principles in contested cases. *See also* Helstad, *New Law on Administrative Rule Making*, 1956 Wisconsin Law Rev. 407.

The court of appeals relied upon several decisions of DILHR which purport to show that DILHR's uniform course of interpretation of the statute requires accommodation. These citations by the court of appeals are unconvincing, because the date of the earliest follows the complaint in the present case by more than two years. The most these administrative interpretations show is that, after the interpretation adopted by DILHR in the present case filed in 1972, DILHR has followed its own interpretations with consistency. But these interpretations or administrative decisions which followed the filing of Bartell's complaint are hardly probative of a uniform and long-standing course of administrative interpretation that would control or strongly influence the outcome of this case. *Cf. State ex rel. B'nai B'rith Fndn. v. Walworth County,* 59 Wis.2d 296, 306, 307, 208 N.W.2d 113 (1973) ; *State ex rel. City Bank & Trust Co. v. Marshall & Ilsley Bank,* 8 Wis.2d 301, 306–07, 99 N.W.2d 105 (1959) ; *Beghin v. Personnel Bd.,* 28 Wis.2d 422, 430, 137 N.W.2d 29 (1965).

American Motors in its brief states that this case was the first in which DILHR asserted that the statute required accommodation. DILHR has not disputed this contention. Moreover, even a long-standing and consistent administrative interpretation of a statute may have little probative effect and should not be followed when plainly erroneous or inconsistent with legislative intent (*Milwaukee Fed. of Teachers, Local No. 252 v. WERC,* 83 Wis.2d 588, 598, 266 N.W.2d 314 (1978) ; *Karow v. Milwaukee County Civil Service Comm.,* 82 Wis.2d 565, 570, 263 N.W.2d 214 (1978)) or when the administrative construction is of a statute dealing with the agency's own power (*Big Foot Country Club v. Dept. of Revenue,* 70 Wis.2d 871, 875, 235 N.W.2d 696 (1975)). The question of legislative intent—did the legislature intend to require an employer to accommodate an em-

ployee's demand for time off for religious observances—is the central question on this appeal.

It has frequently been noted that, in order to be given substantial weight or deference by a court, an administrative agency's construction or interpretation of the legislature's intent in enacting a statute must be reasonably contemporaneous with its passage. *Layton School of Art & Design v. WERC*, 82 Wis.2d 324, 340, 262 N.W. 2d 218 (1978) ; *Wauwatosa v. Milwaukee County*, 22 Wis.2d 184, 189–90, 125 N.W.2d 386 (1963). In this case, the statute was passed by the legislature in 1945. It was not until approximately 1972—almost twenty-seven years after the legislature acted—that DILHR construed the statute to hold that the legislature intended the statute to require accommodation. This "Johnny Come Lately" construction of the statute hardly meets the requirement that there be substantial contemporaneity to be accorded judicial deference. *See Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315 (1933) ; *Guse v. Industrial Comm.*, 189 Wis. 471, 205 N.W. 428, 208 N.W. 493 (1926), Crownhart dissenting.[11]

---

[11] We have noted above that DILHR's administrative construction of the statute does not meet two criteria which might entitle it to some additional weight on judicial review—the "longstanding and consistent" factor, and the "contemporaneous" factor.

Davis identifies these, and two additional, factors as considerations which may prompt a court, in its discretion, to accord weight to administrative construction. The other two are the comparative expertise of the agency and the courts with respect to the particular problem, and whether the statute has been re-enacted while the rule is outstanding. K. Davis, *1 Administrative Law Treatise*, secs. 5.05–5.07, pp. 314–38 (1958). Neither is satisfied here. With regard to comparative judicial and administrative expertise, the question here involved—whether the Fair Employment Act contains a duty to accommodate—is not one within the unusual expertise or capability of DILHR; this is a rather straight-forward question of law and public policy, not an es-

Accordingly, we conclude that, under the circumstances here, the court of appeals erred when it concluded that these administrative interpretations of DILHR were entitled to considerable weight. Rather, it appears that DILHR, following the amendment of 1972 to the Federal Civil Rights Act, which required accommodation under the federal law, was given the impetus to engraft

pecially complex matter requiring extensive familiarity with highly specialized areas of knowledge, which the agency might be more likely to possess than the courts. And with regard to reenactment as evidence of legislative intent or approbation of administrative construction—which, even when it occurs, may be dubious (*see id.* at sec. 5.07, pp. 331–38, and W. Hurst, *Statutes in Court,* at 162–64 n. 9 (1970))—the legislative record during the 1970's subsequent to DILHR's adoption of an accommodation requirement does not reveal sufficient attention to the problem at hand to warrant an inference of approval of such construction.

We note that Professor Davis discusses the above four factors in connection with judicial review of an agency's "interpretative rules"—rules adopted by an agency without a specific delegation of legislative power and therefore subject to close judicial scrutiny and substitution of judicial judgment, *id.* at 315—in contradistinction to "legislative" rules. The latter are rules adopted by an agency pursuant to an express legislative grant of authority; as such they are valid and binding, and not to be re-evaluated by courts as long as they are within the granted statutory power, issued pursuant to proper procedure, and reasonable. *Id.* at 298. *See also Barry Laboratories, Inc. v. State Bd. of Pharmacy,* 26 Wis.2d 505, 132 N.W.2d 833 (1965). However, the same factors —contemporaneity, long-standing construction, and re-enactment— are properly applied even to legislative rules, "with respect to the question whether the legislative rules are within the granted power." Davis, *supra* at 329, 338–39. *See also* K. Davis, *Administrative Law Text,* ch. 5, pp. 123–38 (3d ed. 1972). In the present case, given the practical effect of DILHR's construction of the Fair Employment Act—the construction operated as a rule even though it was not promulgated as one—these factors may be properly applied. None of them is satisfied, reinforcing our conclusion that a duty to accommodate does not reflect the legislative intent in Wisconsin's Fair Employment Act.

the law of another jurisdiction—that of the United States —upon the law of Wisconsin. Under these circumstances, there is no defensible rationale which would lead to the conclusion that the post-1972 interpretations of DILHR were declaratory of the intent of the legislature in 1945, or, for that matter, at any subsequent time.

The history of the federal EEOC regulations which followed the passage of the Federal Civil Rights Act of 1964 is also instructive of the place, if any, that the federal law has in the interpretation and application of the Wisconsin Fair Employment Act. The relevant section of the Civil Rights Act of 1964 was sec. 703(a):

"It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." Civil Rights Act of 1964, Pub. L. 88–352, 78 Stat. 255, 42 U.S.C. 2000e, 2(a)(1) (1976).

At the time of the passage of this act, the chief concern of its proponents was racial discrimination. The background for the passage of the act is discussed at length in Edwards and Kaplan, *Religious Discrimination and the Role of Abritration under Title VII*, 69 Michigan Law Rev. 599. As the authors of this article state:

"Given this intent, it is not surprising that, during the hearings and debates preceding the passage of the Act, Congress focused its attention primarily on the race discrimination problem. . . .

". . . Congress, without bothering seriously to consider or to document the problem, included *religious discrimination* as one of the employment practices proscribed by title VII." P. 600.

In view of the lack of guidelines by specific legislation or meaningful debate, the precise legislative intent of congress in terms of implementation of religious freedom by the control of employment practices is vague indeed. Almost two years after the passage of the Civil Rights Act, the EEOC issued the first of its guidelines on discrimination because of religion, and it imposed "an obligation on the part of the employer to accommodate to the reasonable religious needs of employees . . . ." It diluted this guideline by contemporaneously stating in explanation thereof:

"[A]n employer who closes his business on Christmas or Good Friday is not thereby obligated to give time off with pay to Jewish employees for Rosh Hashanah or Yom Kippur.

" . . .

"The employer may prescribe the normal work week and foreseeable overtime requirements and, absent an *intent* on the part of the employer to discriminate on religious grounds, a job applicant or employee who accepted the job knowing or having reason to believe that such requirements would conflict with his religious obligations is not entitled to demand any alteration in such requirements to accommodate his religious needs." (Emphasis supplied.) 31 Fed. Reg. 8370 (1966), codified at 29 CFR sec. 1605.1 (1967).

These initial guidelines, according to Edwards and Kaplan, *supra*, appropriately reflect the opinion expressed in congressional debates by Senators Humphrey, Clark, and Case that only intentional religious discrimination was to be barred by the original Civil Rights Act. *See also Reid v. Memphis Publishing Co.*, 521 F.2d 512, 519, *reh. en banc den.* 525 F.2d 986 (6th Cir. 1975), *cert. den.* 429 U.S. 964 (1976), *reh. den.* 433 U.S. 915 (1977). *See generally* Edwards and Kaplan, *Religious Discrimination and the Role of Arbitration under Title VII*, 69 Michigan Law Rev. 599 (1971).

Sec. 1605.1 was amended a little over a year later, on July 13, 1967 (32 Fed. Reg. 10298 (1967), codified

at 29 C.F.R. sec. 1605.1 (1968)), and the guideline adopted then, and which remains in effect to the present time (29 C.F.R. sec. 1605.1 (1980), provides:

"(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodation can be made without undue hardship on the conduct of the employer's business. . . .

"(c) . . . the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable."

Under the new guidelines, the reasonable accommodation provision was made far more stringent. Under the Civil Rights Act, if the new guideline of 1967 can be accepted as being declaratory of that law, an employer can avoid the requirement that he make reasonable accommodation only by carrying the burden of proving undue hardship.

In the posture of the case before this court, it is important to remember, however, that the guideline of the EEOC requiring as a matter of federal law the duty of accommodation came twenty-two years after the passage of the Wisconsin Fair Employment Act. Clearly, this pronouncement of a federal administrative agency made two decades after the passage of a Wisconsin act is not probative of the Wisconsin legislature's intent in 1945.

Great difficulty was encountered by the federal courts when they faced the question of the effect to be given the EEOC's 1967 guidelines construing the legislative intent of the 1964 act. One of the first challenges to the EEOC guideline was in *Dewey v. Reynolds Metals Co.*, 429 F.2d 324 (6th Cir. 1970), *aff'd per curiam by an equally divided court* 402 U.S. 689 (1971). That court of appeals, while finding as a fact that there had been

reasonable accommodation by the employer, raised a serious question whether the EEOC had the authority to impose accommodation guidelines on employers under the Civil Rights Act of 1964. The majority of the court of appeals for the Sixth Circuit stated that:

"[T]he gravamen of an offense under the statute is *only* discrimination. The authority of EEOC to adopt a regulation interfering with the internal affairs of an employer, absent discrimination, may well be doubted. [P. 331 n. 1]

". . .

"The fundamental error . . . is that [the parties] equate religious discrimination with failure to accommodate. We submit these two concepts are entirely different. The employer ought not to be forced to accommodate each of the varying religious beliefs and practices of his employees." P. 335.

The Sixth Circuit in the same case stated:

"Nowhere in the legislative history of the Act do we find any Congressional intent to coerce or compel one person to accede to or accommodate the religious beliefs of another. The requirement of accommodation to religious beliefs is contained only in the EEOC Regulations, which in our judgment are not consistent with the Act." P. 334.

*Dewey* was affirmed by an equally divided Supreme Court. 402 U.S. 689 (1971).

*Reid v. Memphis Publishing Co.*, 521 F.2d 512, *reh. en banc den.* 525 F.2d 986 (6th Cir. 1975), *cert. den.* 429 U.S. 964 (1976), *reh. den.* 433 U.S. 915 (1977), also concluded that the EEOC's 1967 guidelines went beyond the legislative intent and were unsupported by legislative history and, although the congressional amendment of 1972 had intervened, it was held that an amendment then did not establish a congressional intent in 1964 to require accommodation with respect to the original statute. On the other hand, the Fifth Circuit in *Riley v.*

*Bendix Corp.,* 464 F.2d 1113, *reh. and reh. en banc den.* (5th Cir. 1972), validated the 1967 EEOC guidelines as expressing the intent of congress.

It would unnecessarily belabor this opinion to try to trace definitively the perilous journey of the EEOC guidelines through the federal courts. Suffice it to say that the federal courts had great difficulty in concluding that the 1967 EEOC guidelines interpreting the federal law constituted a cognizable declaration of the legislative intent of the Civil Rights Act of 1964.

It was not until the case of *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63 (1977), that the United States Supreme Court held that the EEOC's construction in its 1967 guidelines to the 1964 legislation, imposing a reasonable accommodation requirement, was "defensible" and "entitled to some deference." *See Hardison, supra* at 76, n. 11. In the analysis of *Hardison,* it is essential to recognize that in 1972 the congress, by affirmative legislation, added sec. 701(j) to sec. 701 of the Civil Rights Act of 1964, the "Definitions" section, to provide that, for purposes of Title VII:

"(j) The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." Equal Opportunity Act of 1972, Pub. Law 92–261, 86 Stat. 103, March 24, 1972, codified 42 USC sec. 2000e(j) (1976).

*Hardison* makes clear that a reasonable accommodation requirement did not arise because there was evidence of that legislative intent in the 1964 act or because of the 1967 guidelines, but rather such a requirement could now be found because congress had affirmatively ratified the EEOC's administratively created accommodation requirement by the specific 1972 legislation. The holding

of *Hardison* that there was even a *de minimis* duty upon an employer to accommodate was founded not upon the 1964 legislation or the EEOC guidelines, but rather was upon specific subsequent congressional action of 1972.

It is clear, therefore, in the context of the instant case, that *Hardison,* when applied to the Wisconsin situation, leads to the conclusion that the vague provisions in respect to religious discrimination in the 1945 Wisconsin statute did not impose a duty of accommodation, and also that the injection of the EEOC's guidelines or their administrative application by the Wisconsin DILHR cannot have that effect either.

The factors which led the United States Supreme Court to find a requirement of accommodation in *Hardison* are wholly lacking in the history of Wisconsin's legislation or of the administrative practices of the Wisconsin DILHR. No amendment to the legislation has provided for accommodation, and DILHR has not attempted to provide for reasonable accommodation by a legislatively authorized administrative rule, as did the EEOC. The federal experience leads to the conclusion that no effective Wisconsin action, legislative or administrative, has imposed a duty of accommodation upon Wisconsin employers.

The court of appeals also relied on decisions of other state supreme courts which found an accommodation requirement where the state statutory or constitutional provisions prohibit religious discrimination in employment but were silent on the question of the duty to accommodate. These cases from other states are not persuasive. For example, in *Wondzell v. Alaska Wood Products, Inc.,* 583 P.2d 860 (Alaska 1978), *rev'd on other grounds* 601 P.2d 584 (Alaska 1979), the Alaska court noted that its act, adopted in 1965, was "modeled" after the 1964 Federal Civil Rights Act and, accordingly, it concluded that it would review and adopt the decision-

al law under the federal statute. It, therefore, concluded that it was appropriate to follow the federal law and to read a duty of reasonable accommodation into the Alaska statute. The Alaska court relied specifically on the *Hardison* case. The Wisconsin statute, unlike that of Alaska, preceded the federal act by almost twenty years. It cannot be said that the Wisconsin act was modeled after the federal act and that, therefore, we should incorporate the federal decisional law into the interpretations of the Wisconsin statute.

The Maine supreme court's approach may be similarly distinguished. *Maine Human Rights Comm. v. Local 1361, United Paperworkers Int'l Union, AFL–CIO,* 383 A.2d 369, 374 (Maine 1978). The Maine supreme court stated that the state act's legislative history inescapably compelled:

". . . but one conclusion: The employment discrimination provisions in our statute [enacted five years after the Federal Civil Rights Act] were intended to be the state counterparts of the Federal Act, complimenting and in certain instances supplementing the federal. In such circumstances, decisions by federal courts interpreting the federal statutory equivalents of the Maine Act provide significant guidance in the construction of our statute." P. 375.

In addition, the Maine court pointed out that the administrative agency charged with the supervision of the state act had promulgated a "virtual carbon copy" (at 376) of the EEOC's regulation establishing the requirement of reasonable accommodation. These similarities are not to be found in the Wisconsin statute nor in legislative or administrative history of the Wisconsin law.

California also followed federal policy in deciding that state law required accommodation. *Rankins v. Comm. on Professional Competence,* 24 Cal.3d 167, 154 Cal. Rptr.

907, 593 P.2d 852 (1979), *app. dism'd* 444 U.S. 986 (1979). The California court placed primary reliance on the fact that the provision being interpreted was constitutional and not statutory. Moreover, its constitutional provision was adopted in 1974—after the federal statutory policy was resolved by the 1972 amendment to favor accommodation.

Additionally, the California case is inapposite because the conduct in question involved state action—the duty of a California school district's failure to accommodate the religious preferences of a teacher. It therefore relied heavily upon the analogy to the First Amendment to the United States Constitution, which is, of course, applicable only to state action and not to discriminatory practices of private citizens or corporations.

More in point is the contrary holding of the recent case of the Michigan court of appeals, *Department of Civil Rights ex rel. Mary Parks v. General Motors Corp,* 93 Mich. App. 366 (1979), 287 N.W.2d 240, *appeal docketed* 408 Mich. 929 (1980). The statute enacted by the Michigan legislature in 1955 was silent on the question of accommodation. It merely provided:

"It shall be an unfair employment practice:

"(a) for any employer, because of the . . . religion . . . of any individual, to refuse to hire or otherwise to discriminate against him with respect to hire, tenure, terms, conditions or privileges of employment . . . ." P. 371.

The Michigan Department of Civil Rights, expressly relying on the guidelines of EEOC and the amendment to the Federal Civil Rights Law of 1972, adopted interpretative guidelines construing the Michigan statute to impose a duty to accommodate. The Michigan court of appeals held, and the agency acknowledged, that these guidelines were not legislative-type rules and did not in

themselves have the force of law. The court, therefore, considered the statute itself and concluded that the statute as passed by the legislature created no duty on the part of an employer to accommodate the religious practices of employees. It concluded that no such duty was to be found in the words of the statute or could be inferred from the legislative history. It pointed out, relying on the rationale of the *Hardison* case, that the statute itself was silent and there was no express legislative ratification of the agency's guidelines of the kind that the United States Supreme Court found in *Hardison*. The Michigan court commented that the legislature had amended the statute in other ways subsequent to the agency's administrative interpretation of the act but had declined to amend the statute to incorporate the administrative construction which imposed a duty to accommodate.

Basically, however, the central rationale of the Michigan case is that there was nothing in the statute or the history of its enactment which indicated a legislative intent to require accommodation and there was no legislative activity subsequent to the tardy noncontemporaneous administrative construction of the statute which evinced a legislative approval of the agency's interpretation. Accordingly, the posture of the Michigan case almost completely tracks that to be found in the case now before this court. The Michigan court also placed emphasis on the fact that the interpretative guidelines adopted by an agency were not to be given the weight afforded to a legislative-type rule.[12] As in Wisconsin, the administrative agency in Michigan failed to incorporate its administrative interpretation or guidelines into a rule, as it could have under legislatively conferred authority. The Michigan court recognized, as we do in this opinion, that,

[12] *See*, K. Davis, 1 *Administrative Law Treatise*, ch. 5, pp. 285–359 (1958).

while an administrative interpretation given to a statute by an agency charged with its enforcement is entitled to some weight where it accords with circumstances we have described earlier in this opinion, that interpretation is not binding on the court unless it reflects the intention of the legislature.

Because the controlling legislative intent must be that "which pertained at the time the alleged offense occurred, rather than the legislative intent as of the date of a subsequent enactment" (*General Motors* p. 381), the Michigan court refused the attempt of the department of civil rights to bolster its interpretation by reference to the 1972 amendment to the Federal Civil Rights Act and by reference to federal decisions which postdated the Michigan legislative enactment by more than a decade.

Other state supreme courts have also found that administrative regulations requiring accommodation were insufficient to impose that gloss upon a silent statute.[13] However, we believe that the most persuasive of the state court decisions is that of the Michigan court of appeals. That case addresses precisely the same issues as those with which we are confronted and concerns the attempt of the administrative agency to retrospectively engraft an intent upon a legislative enactment by an interpetation that came long after the statute itself.

We, accordingly, conclude that the Wisconsin Fair Employment Act, as adopted by the legislature in 1946, did not impose a duty upon private employers to accommodate the religious practices of their employees and that DILHR's attempt to engraft the present federal statutory law upon the state legislation came far too late

---

[13] *Corey v. Avco-Lycoming Div., Avco Corp.,* 163 Conn. 309, 307 A.2d 155 (1972), cert. den. 409 U.S. 1116 (1973); *Olin v. Fair Employment Practices Comm.,* 67 Ill.2d 466, 475, 367 N.E.2d 1267 (1977) (the Illinois court declined to rule on the precise question).

for us to conclude that it had any relevance to the legislature's intent at the time of the passage of the act. Moreover, despite the changes in the federal law, the Wisconsin legislature to date has not enacted any requirement of accommodation, and DILHR has not by rule, as it could have, adopted such a requirement. It has not recommended such change to the legislature, nor has there been any pattern of past administrative practice or construction which is persuasive in the resolution of this case.

We conclude that the Wisconsin Fair Employment Act imposes no duty upon a private employer to accommodate the religious practices of an employee. The discharge of Bartell was not an act of discrimination under the act, and accordingly the decision of the court of appeals is reversed.

*By the Court.*—Decision reversed.

DAY, J., took no part.

SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. The majority errs in stating that the issue is whether the Wisconsin Fair Employment Act requires the American Motors Corporation to accommodate an employee's work absences which are occasioned by the employee's observance of religious holy days. *Supra,* pp. 340 and 344.[1]

---

[1] I recognize that AMC and DILHR also treat this case as an accommodation case. It is to their mutual advantage to take this position. AMC has a better chance of winning if it casts the issue as discrimination by failure to accommodate rather than as discrimination by another means. Bartell apparently is no longer really interested in the case and DILHR's real interest in pursuing this case is to get a definitive court decision on the issue of accommodation.

For a discussion of the Wisconsin Fair Employment Act, *see* Comment, *Wisconsin Fair Employment Act: Coverage, Procedures, Substance and Remedies,* 1975 Wis. L. Rev. 696, 718–721.

This case does not involve the issue of accommodation. As the majority explains, an accommodation case is one in which the court is to determine "an employer's obligation where arguably there is a conflict between an employee's religious practices and the employer's personnel and management procedures." *Supra,* p. 348.

In this case there is no conflict between Bartell's religious practices and AMC's personnel and management procedures. Bartell requested days off so that he could observe certain holy days of his religion. AMC's personnel and management procedure was to provide days off on principal Christian holy days, such as Christmas and Good Friday, and to provide days off to Jews and others on their obligatory holy days. Thus Bartell's interest in the free exercise of his religion is within the terms of AMC's established employment policies designed for the efficient operation of the business. When AMC refused to provide time off to Bartell AMC failed to follow its own established personnel and management procedures.

By comparison, the employee in an accommodation case is seeking an exception to the employer's uniformly applied personnel and management procedures; the employee is asking for approval of a request not within the uniform policies to which other employees are subject in order to enable the employee to be a faithful adherent and remain employed. Bartell made no such request; he asked only that AMC treat him as it treats employees of other religious persuasions in similar jobs in AMC. Bartell asked AMC to apply its uniform policy to him.

The distinction between this case and one in which accommodation is an issue is apparent from reading the accommodation cases cited by the majority.[2] The first

[2] The Connecticut Supreme Court made this point stating:
"Since the basic claim of the plaintiff was that her employment was terminated because of discrimination against her because of

step in an accommodation case is to determine the general personnel policy of the employer. The second step

her religion, evidence was offered as to the treatment of people of other religious faiths who were employees of the company. Those Jewish employees of Avco who were members of the bargaining unit were not generally permitted to take time off to observe Rosh Hashanah because the bargaining agreement sets forth only specific holidays. Some of these employees may be given the time off without pay, but this is a decision within the discretion of individual departmental supervisors. Yom Kippur is not a listed holiday for employees in the bargaining unit. From time to time employees of various religious beliefs requested time off for religious holidays and Avco acceded to certain of such requests on occasion, but the requests were very irregular and not for the same day for a period of sixteen weeks [as plaintiff requested].

". . .

"Article XIII, sec. 3 of the agreement between Avco and the union provides as follows: 'Neither the Company nor the Union shall discriminate against any employee on account of race, creed, sex or national origin.' The board of arbitration after a full hearing reached the conclusion that there was no discrimination against the plaintiff because of her religion. The language of the arbitrators is significant. 'To put it another way, since the Company does not intend to accommodate itself to individuals schedules, as indeed it could not if it desires to continue to maintain an efficient industrial operation, it cannot accede to grievant's request in this instance without itself being in violation of the . . . Collective Bargaining Agreement proviso. The grievant has no right or entitlement to request the Company so to act." *Corey v. Avco Lycoming Div., Avco Corp.,* 163 Conn. 309, 307 A.2d 155, 158, 159 (1972), *cert. den.* 409 U.S. 1116 (1973) (cited by the majority at p. 368, n. 13).

In *Reid v. Memphis Publishing Co.,* 521 F.2d 512, 513, 522 (6th Cir. 1975), 468 F.2d 346, 348–349 (6th Cir. 1972) (cited by the majority at pp. 360, 362), the employer required employees to be available for work on Saturdays and "never employed a copyreader with the understanding that he would be relieved from working on a particular day." A Seventh Day Adventist was denied a job because he refused to agree to work on Saturday. There was no discrimination. The issue was whether the law required the employer to accommodate.

is to determine whether this general personnel policy was applied to the employee in question. If the general

In *Dewey v. Reynolds Metals Co.,* 429 F.2d 324 (6th Cir 1970), *aff'd per curiam by an equally divided court,* 402 U.S. 689 (1971) (cited by the majority at p. 361), the Reynolds Metals Company's collective bargaining agreement required employees to perform all straight time and overtime required of them by the company; Reynolds Metals required work on Saturdays and Sundays but permitted employees assigned to work on the weekends to be relieved from the assignment by making arrangements for a qualified replacement. Dewey, a member of the Faith Reformed Church, refused to work on Sunday and refused to arrange for a replacement. The court held that Reynolds Metals Company had provided a fair, equitable method of distributing the workload among its employees which did not discriminate against any of them. The issue in the case was then whether the law required Reynolds Metals to accommodate.

In *Riley v. Bendix Corp.,* 464 F.2d 1113, reh. and reh. en banc den. (5th Cir. 1972) (cited by majority at pp. 362, 363), the court found that the general company policies, the company rules and the company working conditions provided for fixed work schedules without deviation for religious practices and further found that these policies, rules and working conditions were applied uniformly and fairly with respect to all employees. The issue was then whether the law required Bendix Corporation to accommodate.

In *Olin Corp. v. Fair Employment Practices,* 67 Ill.2d 466, 367 N.E.2d 1267 (1977) (cited by majority at p. 368, n. 13) and in *TWA v. Hardison,* 432 U.S. 63 (1977) (cited by majority at p. 363), the burdens of weekend work were a matter for collective bargaining and there was no complaint that the rules set forth in the bargaining agreement were not fairly or uniformly applied. The complainants in both cases wanted to be treated as exceptions to the generally established work rules applicable to all employees. The issue in the cases was did the law require the corporations to accommodate.

In *Maine Human Rts. Comm. v. Local 1361, United Paperworkers Int'l Union,* 383 A.2d 369 (Maine 1978) (cited by the majority at p 365) and in *Wondzell v. Alaska Wood Products, Inc.,* 583 P.2d 860 (Alaska 1978) (cited by the majority at p 364), it is clear that the unions permitted no exceptions to the payment of monthly union dues and that a Seventh Day Adventist was asking

policy was applied uniformly and thus without overt discrimination, the court reaches the question of whether the statutory prohibition against discrimination requires the employer to permit exception to its general policy for this particular employee, that is whether the statutory prohibition against discrimination requires the employer to accommodate for the religious practices of the employee. AMC's general policy was to give employees time off on religious holidays. AMC refused to apply this policy to Bartell. If the refusal to apply a general policy to an employee is overt discrimination there is no reason to consider whether accommodation is required. Accordingly, the court must first determine whether this conduct constitutes overt discrimination because of creed.

An employer's refusal to grant all employees regardless of creed the same terms or conditions of employment is discrimination. The requirement that an employer grant all employees regardless of creed the same terms or conditions of employment is a requirement of equal treatment, not accommodation. I conclude that AMC's dismissal of Bartell because he requested time off for religious holidays constituted discrimination because of creed in violation of secs. 111.32(5)(a) and 111.325,

for special dispensation to refrain from payment. The issue in these cases was whether the law required the unions to accommodate.

Implicit in *Rankins v. Comm'n on Prof. Comp. of Ducor*, 24 Cal.3d 167, 154 Cal. Rptr. 907, 593 P.2d 852 (1979), *app. dism'd*, 444 U.S. 986 (1979) (cited by the majority at p. 365) and in *Dept. of Civil Rts. ex rel. Mary Parks v. General Motors Corp.*, 93 Mich. App. 366 (1979), 287 N.W.2d 240, *app. docketed*, 408 Mich. 929 (1980) (cited by the majority at p. 366), is that the employer allowed no other person to be present for religious reasons during the regular scheduled work period to the extent demanded by these employees. The issue in these cases was whether the law required the unions to accommodate.

Stats. 1979–80. I would therefore affirm the decision of the court of appeals.

I further conclude that if I viewed this case as raising the issue whether refusal to accommodate constitutes discrimination because of creed in violation of secs. 111.32(5)(a), 111.325, Stats. 1979–80, I would agree with the reasoning of the circuit court and the court of appeals, not the majority opinion. I therefore dissent.

## I.

The Wisconsin Fair Employment Act makes it unlawful for an employer to discriminate against an employee because of creed "with regard to hiring, tenure or term, condition or privilege of employment." Secs. 111.32(5)(a) and 111.325, Stats. 1979–80.

In determining whether an employer's conduct constitutes proscribed discrimination, the threshold issue is one of statutory construction: what did the legislature intend when it prohibited discrimination because of "creed" with regard to "hiring, tenure or term, condition or privilege of employment"?

Absent a specific statutory definition, this court has defined terms in the Wisconsin Fair Employment Act in their commonly accepted dictionary sense. Accordingly, "creed" means "a system of religious beliefs." A system of religious beliefs includes religious observances and practices, as well as articles of faith. *Augustine v. Anti-Defamation League of B'nai B'rith*, 75 Wis.2d 207, 249 N.W.2d 547 (1977).[3] To "discriminate," in common usage, means, *inter alia*, "to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit." *Webster's Third New Inter-*

---

[3] Creed is defined in *Webster's Third New International Dictionary*, p. 533, as "a formulation or epitome of principles, rules, opinions, and precepts formally expressed and seriously adhered to and maintained."

*national Dictionary* p. 648. This definition is consistent with the definition of discrimination appearing in sec. 101.22(1m)(b), Stats. 1979–80, which is also enforced by DILHR. Sec. 101.22(1m)(b), which prohibits discrimination in housing, defines discrimination as follows:

" 'Discriminate' and 'discrimination' mean to segregate, separate, exclude or treat any person unequally only because of sex, race, color, physical condition, developmental disability as defined in 51.01(5), religion, national origin or ancestry."

Applying these accepted definitions to the Wisconsin Fair Employment Act, I conclude that the Act's prohibition against discrimination because of creed means that an employer cannot lawfully differentiate in its treatment of employees on the basis of the religious beliefs and religious practices of the employees. The issue for the court is therefore whether on the basis of DILHR's findings of fact and on the undisputed evidence in the record, it appears that when AMC dismissed Bartell it was differentiating in its treatment of employees on the basis of the employees' religious beliefs and practices.

Generally the application of a legal standard to the facts is viewed as a legal question which this court may determine. We have often stated that the court is not bound by the agency's determination of a question of law and may properly substitute its judicial judgment. *Supra,* p. 353; *Nottelson v. ILHR Dept.,* 94 Wis.2d 106, 114–117, 287 N.W.2d 763 (1980); *Bucyrus-Erie Co. v. ILHR Dept.,* 90 Wis.2d 408, 417, 280 N.W.2d 142 (1979).

To determine whether AMC discriminated, I look first to the findings of fact and the undisputed evidence.

The employee, Thomas Bartell, is a member of the Worldwide Church of God. Like other religions the Worldwide Church of God denominates certain days as religious holy days during which the adherent does not

engage in secular work. Two such religious holy days are involved in this case: the Day of Atonement (Monday, September 18, 1972), and the Feast of Tabernacles (Friday, September 22 through Friday, September 29, 1972). On the first and last days of the Feast of Tabernacles, adherents are not to do secular work and during the feast week the adherents are required to attend a regional religious convention. In 1972 the regional religious convention which Bartell attended was held in Wisconsin Dells and was attended by 10,000. Bartell testified that his religious beliefs required his attendance at this convention. In accordance with his religious beliefs and practices Bartell, in August 1972, requested that he be excused from work on September 18, 22, and 25 to 29, 1972. Bartell's request was denied.

AMC's refusal to excuse Bartell from work on his obligatory religious holy days is contrary to AMC's policy to give employees days off for religious purposes. According to the testimony of AMC's Director of Industrial Relations at the Milwaukee body plant: "When Jewish personnel require time off to celebrate their holidays, they are given the time off. They may or may not get paid for the time off depending on their plant or area. We allow them the time off. Whether they're compensated for it or not is another matter. It is the company policy to allow a person a day off if they indicate that their religion requires them to take the day off." The majority recognizes that AMC has a policy of allowing employees to take time off if required for religious purposes. The majority states: "There is also evidence in the record that it was the policy and the usual practice for American Motors to permit sincere believers to abstain from work on obligatory holy days. . . . The record in this case clearly would not warrant a conclusion that American Motors, as a matter of policy, disregarded the religious needs of its em-

ployees. The order of DILHR that American Motors 'cease and desist from discharging employees on the basis of religion' was unjustified and unsupported by the record." *Supra,* p. 344.

The only conclusion that may be drawn from the record is that AMC treated Bartell differently than it treats employees of other religious persuasions. AMC would have released a person of the Jewish faith from work on Monday, September 18, 1972, Yom Kippur. Yet AMC refused to excuse Bartell, a member of the Worldwide Church of God, from work on the very same day, Monday, September 18, 1972, the Day of Atonement, to celebrate that holy day according to his religious beliefs.

The record reveals that Bartell does not differ from AMC's other employees in any respect other than his creed.

AMC attempted to persuade DILHR that its refusal to grant Bartell the same terms, conditions or privileges of employment as it grants other employees of different religious persuasions was based not on Bartell's creed but on Bartell's deceptive conduct towards AMC. AMC attempted to show that Bartell was deceptive in not telling AMC of his need for days off when he began the program. DILHR concluded, however, that deception had not been proved. As the majority opinion correctly points out, the factual determination that Bartell was terminated for his insistence on observing his religious holy days and not for deception, "was for DILHR to make and would not be disturbed by the court." *Supra,* p. 343.

AMC also attempted to show that its refusal to grant Bartell the same terms, conditions or privileges of employment as it grants other employees of different religious persuasions was based not on Bartell's creed

but on the special nature of the training program in which Bartell was participating.[4]

This training program, then brand new at AMC, had a total of three enrolees, Bartell, Abdin and Johnson. The AMC supervisor in charge of the training program, testifying on direct examination, characterized the program's schedule for these three employees as "iron-clad." However, on cross examination he stated that neither Abdin nor Johnson followed the schedule as planned. He further explained that Abdin was allowed to tack his days missed while on another assignment on to the end of the training schedule. He further testified that this "tacking" procedure could have been used for Bartell.

DILHR found that it was uncontroverted on the record that AMC could have released Bartell from work on his obligatory holy days "without any undue hardship on [AMC's] business." The circuit court reached the same conclusion, saying:

"While [the supervisor] stated that he would have had to 're-do the entire schedule' to accommodate the claimant's request for time off, he also admitted that he could have merely excused the claimant from one segment of his program and re-assigned him to that department at the end of the schedule. This procedure was followed with one of the other two trainees in the program for the convenience of the company. The record fails to show any reason why the complainant could not have been ac-

---

[4] The testimony of an AMC supervisor can be read to mean that although AMC's policy was to allow time off for observance of obligatory religious holidays this policy did not apply if it was "critical" for the job that the employee not be released. The AMC supervisor said: "Some people work on seven-day operations. If we had somebody who had to be off every Saturday and every Sunday, we'd terminate him. We could transfer him to a department where the particular days off would not be critical. A person could be transferred. It would be difficult if he were a specialist."

commodated in the same fashion. Although the claimant could have raised the problem earlier, it is clear that this delay in itself did not create any difficulties in accommodating the request for time off. The only 'hardship' which appears is the time it would have taken to alter the claimant's schedule."

Thus the record shows that AMC's refusal to grant Bartell the same terms, conditions or privileges of employment as it granted other employees, namely time off for obligatory religious holy days, was not predicated on Bartell's deception, or on the special nature of Bartell's job, or on any other lawful reason. The record shows Bartell was fired because of his insistence on adhering to his creed.

This record shows no justification for AMC's refusal to apply to Bartell its general policy of releasing employees on obligatory religious holy days. AMC's refusal, without any justification, to accord Bartell, who was of a particular religious persuasion, the same terms, conditions or privileges of employment it accorded substantially similarly situated employees of other religious persuasions, constitutes discrimination under secs. 111.-32(5)(a) and 111.325, Stats. 1979–80. Having adopted a policy of releasing employees from work on obligatory religious holidays (when this release does not substantially interfere with job performance), AMC cannot apply this policy in a discriminatory manner which violates the Fair Employment Act. This court recognized this principle in *Ray-O-Vac v. ILHR Depart.*, 70 Wis.2d 919, 931, 236 N.W.2d 209 (1975):

"The parties all agree that a private employer is not compelled by law to provide benefits in the case of temporary disability, and so do we. However, if he chooses to do so, it must be under a plan which does not discriminate on any basis prohibited by the fair employment law."

An employer like, AMC who, without justification, denies members of one creed a privilege which it grants to members of other creeds, whether the denial arises from evil motive or bureaucratic error, violates the law. AMC's conduct in this case cannot be characterized as a neutral, fair application of a neutral-on-its-face policy or practice. AMC directly, openly and without any business justification treated similarly situated employees of different religious persuasions differently.

The purpose of the Fair Employment Act is to prohibit employers from compelling an individual to choose between religious faith and economic survival. Sec. 111.31 (1), Stats. 1979–80. To accomplish this result the state has mandated that persons of different religious faiths as well as those of no religious faith receive fair treatment in the employment market. The Act assures employees that employment decisions will not be based on impermissible grounds such as creed. The Act is an empty guaranty unless it is invoked to halt discrimination of the kind involved here.

I conclude that AMC violated the Wisconsin Fair Employment Act, and I would therefore affirm the decision of the court of appeals. The majority reaches a contrary result because it has posed the wrong question.

## II.

Even if I were to conclude that the case at bar raises the question whether refusal to accommodate constitutes discrimination, I would conclude, as did the circuit court and court of appeals, that in enacting secs. 111.31, 111.-32(5) (a), 111.325, Stats. 1979–80, the legislature intended to include within the phrase "discrimination because of creed" an employer's refusal, without business justification, to take reasonable steps not amounting to an undue burden to accommodate an employee's free

exercise of religion. I view, for the reasons set forth by the court of appeals, that the statute is constitutional as so construed.

The centrality of religious freedom in the history of this country is a matter of general knowledge. Americans are a religious people. The United States of America was founded by persons seeking freedom to worship as they pleased or not to worship if they pleased. American citizens have a continuing and abiding interest in protection from religious discrimination. The Wisconsin legislature has responded to this interest by mandating that employment opportunities not be denied any person because of creed. Secs. 111.32(5)(a), 111.325, Stats. 1979–80. To accomplish this end the Wisconsin legislature has instructed the courts to construe the fair employment practices act "liberally" to accomplish the declared public policy of the state which is "to encourage and foster to the fullest extent practicable the employment of all properly qualified persons regardless of their age, race, creed, color, handicap, sex, national origin or ancestry." Sec. 111.31(3), Stats. 1979–80.

The majority concludes that this legislative direction of liberal construction does not authorize a court "to import into the act specific provisions that the legislature omitted." *Supra*, p. 350. I agree. But I do not think that interpreting "discrimination because of creed" to include the duty to accommodate is importing into the Act specific provisions that the legislature omitted. Taking the opposite view, the majority apparently concludes that characterizing an employer's refusal to accommodate as falling within the meaning of the statutory phrase "discrimination because of creed" is error, because such a characterization would import into the statute a specific provision, namely the duty to accommodate, that the legislature omitted. The majority does not say how it knows that the Wisconsin legislature omitted this spe-

cific provision from the meaning of the phrase "discrimination because of creed," a legal standard which is capable of bearing several meanings and which must be applied to a multitude of fact situations. The legislature has not stated in the Act whether discrimination does or does not include the duty to or refusal to accommodate. As the majority admits, the most that can be gleaned from the legislative history is that the legislature has not enacted any bill which proposed incorporating an accommodation provision into the statute. And the majority correctly concludes that it does not believe "it would be logical or reasonable to assert that the failure of this bill to be enacted constitutes a legislative rejection of the duty to accommodate." *Supra,* p. 349.

To support its conclusion the majority looks to extrinsic aids to determine the intent of the Wisconsin legislature. Thus, the majority looks to, but refuses to give weight to, DILHR's long-standing (as of the date of this opinion) but noncontemporaneous construction of the Act. The majority reviews several federal and state court decisions in which the court had to decide whether a statutory provision similar to Wisconsin's statute prohibiting "discrimination because of creed" encompassed a duty to accommodate. Some courts concluded the statutory phrase included the concept of accommodation and other courts reached the opposite conclusion; the result depended on which factors indicative of legislative intent that court found most persuasive. I conclude from these cases, in particular the *TWA-Hardison* case and the federal cases prior to the 1972 federal statutory amendment, that reasonable courts can reach different conclusions as to whether a particular legislative body intended "discrimination because of creed" to encompass a duty to accommodate.

I look to the language of and the objective to be accomplished by the Fair Employment Act to determine the legislature's intent as to the meaning of "discrimination because of creed." The Wisconsin legislature, un-

like Congress or other state legislatures, has set forth the objective of the Act and has given the court guidance to determine the meaning of and application of the Act. The Wisconsin legislature has directed that where there may be more than one reasonable way to interpret or apply the Wisconsin Fair Employment Act, this court is to interpret and apply the Act in the way that will "encourage and foster to the fullest extent possible the employment of all properly qualified persons regardless of their . . . creed . . . ." Sec. 111.31(3), Stats. 1979–80. Recognizing this statement of legislative policy, purpose and intent as an interpretive aid, this court has in prior cases declined to give the Fair Employment Act a "too constrictive" reading, saying:

"The Wisconsin Fair Employment Code was promulgated so as to encourage and foster to the fullest extent practicable the employment of all properly qualified persons. To accomplish this goal, the code restricted the employer's right to discriminate against those individuals who, though female, old, handicapped or whatever, could function efficiently on the job. If the individual can function efficiently on the job, then the mere fact that he is different from the average employee as to those statutorily proscribed bases may not be used as a basis for discrimination. To effectuate this purpose, the code is to be liberally construed. Sec. 111.31(3), Stats." *Chicago, M., St. P. & P. RR. Co. v. DILHR,* 62 Wis.2d 392, 397, 215 N.W.2d 443 (1974).

Giving "the terms actually used by the legislature . . . the fullest application within proper definitional guidelines that are consistent with the spirit of the legislation" (*Supra,* p. 351), I conclude that an employer's refusal to make reasonable accommodation for a member of a minority faith when there is no undue hardship on the employer falls within the language of the statute barring discrimination.

This court said in *Wisconsin Tel. Co. v. DILHR,* 68 Wis.2d 345, 368, 228 N.W.2d 649 (1975), that "the broad purpose of the Fair Employment Act is to eliminate practices that have a discriminatory impact as well as prac-

tices which on their face amount to invidious discrimination." I am persuaded that an employer's refusal to make a reasonable accommodation for a member of a minority faith when there is no undue hardship on the employer has a discriminatory impact on the employment opportunity of members of minority faiths substantially similar to that resulting from overt invidious discrimination of the kind illustrated by a sign saying: "No person who obeys the tenets of a minority religion need apply." In both situations the employer forces the employee to choose between job and creed when the creed does not adversely affect job performance. Both practices have significant discriminatory impact. Both practices violate the Act.

Perhaps the point is better illustrated by anticipating the practical effect of the majority decision. After reading the majority opinion, I tried to put myself into the position of an attorney whose client has requested her to draft a notice to be given to job applicants explaining the company's now legalized "no accommodation" personnel policy. I drafted the following notice:

## WE WANT TO EXPLAIN—WE DO NOT ACCOMMODATE

"It is our strict and unbending policy not to give employees days off for religious holy day observances. Our employees need not work on the afternoon of December 24, the day of December 25, and the afternoon of Good Friday. We know these times off coincide with the religious holy days of the majority religions in this country. We give these days off because it is customary in the United States for businesses to do so, not because it is the policy of this company to give employees days off for religious holy day observances.

"It would not be very difficult for us to allow an employee who is a member of a non-majority religious faith to take off up to 10 days a year without pay to observe their obligatory religious holy days; we would have to make adjustments in our record keeping systems, but neither our business nor our other employees would be

seriously inconvenienced. You need not explain these facts to us. We are aware of them. Nevertheless it is our strict and unbending policy not to give employees days off for religious holy day observances.

"We do not view our policy of giving everyone time off on December 24, December 25 and Good Friday as favoring the majority religions. We do not view our policy of denying time off without pay to employees of non-majority religious faiths for their obligatory religious holy days as disfavoring minority religions. We view our 'no accommodation policy' as a neutral policy, neither favoring nor disfavoring persons of particular religious persuasions or of no religious persuasion.

"We support your right to the free exercise of your religion. Your right is guaranteed by the Constitutions of the United States and Wisconsin. We support the constitutions. But if you want time off to observe your obligatory religious holy days you cannot work here. Don't ask us to make an exception for you. Our answer will be no. We hope you understand our position. We do not accommodate."

The substance of this notice would not violate the majority's interpretation of the state legislative proscription against discrimination because of creed. The substance of this notice is that the employer's condition for employing members of a minority religion is that they give up their creed even though allowing them to observe their religious beliefs and practices would not cause undue burden on the employer and would not interfere with their ability to perform the job satisfactorily for the employer; the employer does not impose the same condition for employing members of a majority religion.

I do not believe that the legislature intended this court to interpret the Wisconsin Fair Employment Act in a way that would permit employers to adopt the kind of employment practice my notice sets forth. I do not think this kind of employment practice is what the legislature had in its collective mind when it said that "it is declared to be the public policy of the state to encourage and foster to the fullest extent practicable the employment of all properly qualified persons regardless of

their age, race, creed, color, handicap, sex, national origin or ancestry. This subchapter shall be liberally construed for the accomplishment of this purpose."[5]

I dissent because I think the position taken by the majority is inconsistent with the Act and its statement of

[5] The full Declaration of Policy (sec. 111.31, Stats. 1979–80) is as follows:

"111.31 **Declaration of policy.** (1) The practice of denying employment and other opportunities to, and discriminating against, properly qualified persons by reason of their age, race, creed, color, handicap, sex, national origin, ancestry, arrest record or conviction record, is likely to foment domestic strife and unrest, and substantially and adversely affect the general welfare of a state by depriving it of the fullest utilization of its capacities for production. The denial by some employers, licensing agencies and labor unions of employment opportunities to such persons solely because of their age, race, creed, color, handicap, sex, national origin, ancestry, arrest record or conviction record, and discrimination against them in employment, tends to deprive the victims of the earnings which are necessary to maintain a just and decent standard of living, thereby committing grave injury to them.

"(2) It is believed by many students of the problem that protection by law of the rights of all people to obtain gainful employment, and other privileges free from discrimination because of age, race, creed, color, handicap, sex, national origin or ancestry, would remove certain recognized sources of strife and unrest, and encourage the full utilization of the productive resources of the state to the benefit of the state, the family and to all the people of the state.

"(3) In the interpretation and application of this subchapter, and otherwise, it is declared to be the public policy of the state to encourage and foster to the fullest extent practicable the employment of all properly qualified persons regardless of their age, race, creed, color, handicap, sex, national origin or ancestry. This subchapter shall be liberally construed for the accomplishment of this purpose.

"(4) The practice of requiring employes or prospective employes to submit to honesty tests without providing safeguards for the test subjects is unfair, and the use of improper tests and testing procedures causes injury to the employes and prospective employes."

this state's strong and long-standing public policy fostering religious equality and diversity in our pluralistic society. Fortunately the Wisconsin legislature has the opportunity to set the record straight.