DEPARTMENT OF CIVIL RIGHTS *ex rel* MARY PARKS v
GENERAL MOTORS CORPORATION

Docket No. 78-1885. Submitted April 10, 1979, at Detroit.—Decided
November 5, 1979.

Mary Parks was hired by General Motors Corporation, Fisher
Body Division, on September 18, 1972, as an hourly employee
on the second shift (4 p.m. to 12:30 a.m.). As a practicing
Seventh Day Adventist, Mary Parks was forbidden, by her
religion, from working on the Sabbath. The Seventh Day Ad-
ventist faith celebrates the Sabbath from sundown Friday to
sundown Saturday. As a consequence, Mary Parks refused to
work her regular shift on Friday, September 22, 1972. Four
days later, on September 26, 1972, the Michigan Civil Rights
Commission promulgated "interpretive guidelines" to the effect
that the prohibition in the Michigan State Fair Employment
Practices Act (FEPA) against discrimination included a duty to
make reasonable accommodation to an employee's religious
needs.

On September 29 and October 6, 1972, the claimant refused
to work her regular shift. Each of the proposed absences and
the reasons therefor were reported by Mary Parks to her
foreman on the Thursday preceding the absences. As a result of
these absences, Mary Parks' employment was terminated on
October 9, 1972, for the reason that she was "unable to meet
the conditions of employment".

Mary Parks then filed a complaint with the Michigan Civil
Rights Commission alleging that General Motors Corporation
had unlawfully discriminated against her on the basis of her
religion by releasing her from employment.

The Civil Rights Commission determined that religious dis-
crimination had occurred by finding that the respondent could
have made reasonable accommodations to the claimant's reli-
gious needs and, thereby, could have avoided the termination of
employment. The respondent was ordered to cease and desist

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 1 Am Jur 2d, Administrative Law §§ 95, 96.
[3] 15 Am Jur 2d, Civil Rights § 196.

from discriminating against the claimant on the basis of religion, to reinstate the claimant in her former position or a comparable position and to pay the claimant all back pay which had accrued since the alleged discrimination.

The order of the Civil Rights Commission was appealed to Oakland Circuit Court. Francis X. O'Brien, J., issued an opinion ruling that the Michigan Civil Rights Commission exceeded its authority in adopting and enforcing its religious accommodation guidelines and issued an order setting aside the Commission's order, ruling that, based upon applicable authority, the Michigan Civil Rights Commission could not require employers to make reasonable accommodations to the religious needs of its employees. The Department of Civil Rights now appeals to the Court of Appeals. *Held:*

1. The Michigan Civil Rights Commission cannot legislate or impose substantive duties or penalties beyond the scope of the legislative enactment authorizing it to prohibit religious discrimination. The Commission's interpretive guideline, setting forth the agency's view of § 3(a) of the FEPA is not binding in law. No sanction may be imposed by the Commission for the violation of the guideline.

2. The provision of the FEPA (since repealed by the Elliott-Larsen Civil Rights Act) which prohibited religious discrimination in employment practices (§ 3[a]) did not include a duty for employers to make reasonable accommodations to the religious needs of employees. Such a construction goes beyond the legislative mandate set forth in § 3(a) of the FEPA. Fisher Body was under no obligation to make affirmative accommodations to conform to the employee's religious needs.

The order of the circuit court reversing the order of the Civil Rights Commission is affirmed.

1. ADMINISTRATIVE LAW — CIVIL RIGHTS COMMISSION — INTERPRETIVE GUIDELINES — MICHIGAN STATE FAIR EMPLOYMENT PRACTICES ACT — STATUTES.

An interpretive guideline of the Civil Rights Commission, which sets forth that agency's view of the section of the now-repealed Michigan State Fair Employment Practices Act which prohibited discrimination in employment on the basis of, among other things, religion, is not binding in law since this guideline is nothing more than "an agency statement or declaration of policy which the agency intends to follow, which does not have the force or effect of law, and which binds the agency but does not bind any other person" (MCL 423.303[a]; MSA 17.458[3][a], now repealed).

2. ADMINISTRATIVE LAW — INTERPRETIVE GUIDELINES — SANCTIONS — STATUTES.

An administrative agency cannot adopt a guideline in lieu of a rule; an agency's use of an "interpretive guideline" does not elevate the agency's statement of policy contained therein to the status of a legislative rule and no sanction may be imposed for violation of it; if a sanction is to be imposed, the agency will have to rely not on its interpretation of a statute but on the statute itself (MCL 24.226; MSA 3.560[126]).

3. CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — RELIGIOUS DISCRIMINATION — MICHIGAN STATE FAIR EMPLOYMENT PRACTICES ACT — STATUTES.

The prohibition on discrimination in employment on the basis of religion, in the now-repealed Michigan State Fair Employment Practices Act, did not impose an obligation on an employer to make affirmative accommodations to conform to an employee's religious needs (MCL 423.303[a]; MSA 17.458[3][a], now repealed).

*Otis M. Smith,* General Counsel (by *Michael J. Connally),* for General Motors Corporation.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Michael A. Lockman* and *Gary Kress,* Assistants Attorney General, for defendant.

Before: BEASLEY, P.J., and ALLEN and D. C. RILEY, JJ.

ALLEN, J. This case presents a question of first impression in this jurisdiction: Whether the Michigan State Fair Employment Practices Act (FEPA), and in particular § 3(a) thereof, MCL 423.303(a); MSA 17.458(3)(a), prohibiting an employer "to discriminate against" any employee because of religion also imposes a duty on the employer to make reasonable accommodation to the religious needs of employees. The trial court answered that question in the negative and the Department of Civil Rights appeals of right. We affirm. However, our

affirmance is limited to the FEPA and does not extend to the Elliott-Larsen Civil Rights Act which replaced the FEPA effective March 31, 1977.[1]

## FACTUAL BACKGROUND

This action originated with a complaint filed with the Michigan Civil Rights Commission by the claimant, Mary Parks, on October 19, 1972, alleging that the respondent, General Motors Corporation, Fisher Body Division, had unlawfully discriminated against her on the basis of religion by releasing her from employment. The case was decided below, and was submitted to this Court on a stipulation of facts entered into by the parties on March 2, 1976.

On September 18, 1972, the claimant was hired by the respondent as an hourly employee on the second shift (4 p.m. to 12:30 a.m.) at its Pontiac, Michigan plant. As a practicing Seventh Day Adventist, the claimant was forbidden, for religious reasons, to work on the Sabbath. The Seventh Day Adventist Sabbath is celebrated from sundown Friday to sundown Saturday. As a consequence of her strict observance of the Sabbath, claimant refused to work on Friday, September 22. Four days later, September 26, 1972, appellant, Michigan Civil Rights Commission, promulgated "interpretive guidelines" to the effect that the statutory prohibition against discrimination included a duty to make reasonable accommodation to the employee's religious needs. Three days after the promulgation of the guidelines, Friday, September 29,

[1] The FEPA was repealed upon passage of the Elliott-Larsen Civil Rights Act, 1976 PA 453, effective March 31, 1977, MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.* Claimant, Mary Parks, was discharged while the FEPA was in effect. Therefore that statute and not the Elliott-Larsen Act governs. *Civil Rights Comm v Chrysler Corp,* 80 Mich App 368, 372, fn 1; 263 NW2d 376 (1977).

and the following Friday, October 6, 1972, claimant refused to work on her Sabbath. Each of her proposed absences and the reasons therefor were reported by claimant to her foreman on the Thursday preceding the absences. As a result of these religion-based absences, the claimant's employment with the respondent was terminated on October 9, 1972, for the reason that she was "unable to meet conditions of employment".

Following the filing of a complaint charging the employer with religious discrimination against the claimant, the Michigan Civil Rights Commission issued an administrative charge on September 8, 1975. Based upon the submitted stipulation of facts, the commission determined that religious discrimination had occurred by finding that the respondent could have made reasonable accommodations to the claimant's religious needs, and thereby could have avoided her termination. An opinion to this effect was issued by the commission on September 23, 1976, and the respondent was ordered to cease and desist from discriminating against claimant on the basis of religion, to reinstate claimant in her former or a comparable position, and to pay claimant all back pay accrued since the alleged discrimination.

On October 6, 1976, the order was appealed to the circuit court wherein the court issued an opinion ruling that the Michigan Civil Rights Commission exceeded its authority in adopting and enforcing its religious accommodation guidelines. Accordingly, on April 26, 1978, the circuit court judge issued an order setting aside the Commission's order and ruling essentially that based upon applicable authority the Michigan Civil Rights Commission could not require employers to reasonably accommodate the religious needs of its employees. Claimant appeals to this Court.

APPLICABLE LAW

Section 3 of FEPA, 1955 PA 251 as amended; MCL 423.303; MSA 17.458(3), provides in pertinent part:

"It shall be an unfair employment practice:

"(a) For any employer, because of the race, color, religion, national origin or ancestry of any individual, to refuse to hire or otherwise to discriminate against him with respect to hire, tenure, terms, conditions or privileges of employment, or any matter, directly or indirectly related to employment, except where based on a bona fide occupational qualification."

This section remained essentially unchanged[2] until the passage of the Elliott-Larsen Civil Rights Act in 1976,[3] and reflects rights later acknowledged in the state constitution. Const 1963, art 1, § 2, art 5, § 29, *Pompey v General Motors Corp,* 385 Mich 537, 559, fn 20; 189 NW2d 243 (1971). However, these constitutional provisions did not create or define new civil rights in the area of private discrimination. Const 1963, art 1, § 4, *Pompey v General Motors Corp, supra.*

Following the lead of the Federal government,

[2] Amendments prohibiting employment discrimination on the basis of age or sex were enacted in 1965 and 1966 respectively. 1965 PA 344, 1966 PA 349.

[3] In pertinent part, § 202(1) of the new civil rights statute states:

"An employer shall not:

"(a) Fail or refuse to hire, or recruit, or discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

"(b) Limit, segregate, or classify an employee or applicant for employment in a way which deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status." MCL 37.2202(1)(a), (b); MSA 3.548(202)(1)(a), (b).

on September 26, 1972, the Michigan Civil Rights Commission promulgated "interpretive guidelines" construing § 3(a) of the FEPA as imposing an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business.[4] In making this interpretation the commission drew "on the well developed body of federal law". The statutory authority relied on by the commission in issuing this "interpretive guideline" allowed the commission to adopt, amend and repeal rules and regulations to carry out the provisions of the act, in accordance with the Administrative Procedures Act (MCL 24.71 *et seq.;* MSA 3.560[7] *et seq.,* and MCL 24.101 *et seq.;* MSA 3.560[21.1] *et seq.,* repealed and replaced by 1969 PA 306, as amended, MCL 24.201 *et seq.;* MSA 3.560[101] *et seq.),* MCL 37.5(e); MSA 3.548(5)(e) since repealed, and

"To issue such publications * * * as in its judgment will tend to promote good will and minimize or eliminate discrimination." MCL 37.5(j); MSA 3.548(5)(j) since repealed.

In addition, the commission cited as its authority for the "interpretive guideline" MCL 24.207(h); MSA 3.560(107)(h). This provision excepts from the general definition of a "rule":

"an interpretive statement, a guideline, an informational pamphlet or other material which in itself does not have the force and effect of law but is merely explanatory."

---

[4] CCH, Employment Practices Guide, ¶ 24,235, pp 8635-5 through 8635-7; BNA, Labor Relations Reporter, Fair Employment Practices Manual, § 455-1091.

In stating its "Guidelines on Religious Discrimination" the commission relied on MCL 24.232(4); MSA 3.560(132)(4) which permits any administrative agency to adopt, by reference in its *rules,* any regulation adopted by an agency of the Federal government. In so noting, the commission went on to adopt by reference the Guidelines on Religious Discrimination promulgated by the United States Equal Employment Opportunity Commission (EEOC) on July 10, 1967, and which appear in 29 CFR 1605 (1967).

Appellant correctly acknowledges that it cannot legislate or impose substantive duties or penalties beyond the scope of the legislative enactment authorizing it to prohibit religious discrimination. *Coffman v State Board of Examiners in Optometry,* 331 Mich 582; 50 NW2d 322 (1951), *McKibbin v Corporation & Securities Comm,* 369 Mich 69; 119 NW2d 557 (1963). The Civil Rights Commission's concession that the mere issuance of this "interpretative guideline", setting forth the agency's view of § 3(a) of the FEPA, is not binding in law, is correct since this guideline is nothing more than "an agency statement or declaration of policy which the agency intends to follow, which does not have the force or effect of law, and which binds the agency but does not bind any other person". MCL 24.203(b); MSA 3.560(103)(6). In addition, neither the authority relied on by the commission in issuing this guideline, nor the procedure followed in promulgating it, MCL 24.224; MSA 3.560(124), allows the commission to have its interpretation of § 3(a) given the force and effect of law *qua* rule. Bienenfeld, Michigan Administrative Law, 4-3 through 4-6, (ICLE, 1978). An agency cannot adopt a guideline in lieu of a rule. MCL 24.226; MSA 3.560(126). Thus, the agency's use of

an interpretive guideline does not elevate the statement to the status of a legislative rule and no sanction may be imposed for violation of it. Hence,

"If a sanction is to be imposed, the agency will have to rely not on its interpretation of the statute but on the statute itself." Bienenfeld, Michigan Administrative Law, 4-6 (ICLE 1978),

and see, 1 Cooper, State Administrative Law, p 265 (1965), Davis, Administrative Law Text, § 5.03 (3d ed, 1972).[5]

Since it is clear that the interpretive guideline construing § 3(a) of the FEPA has no legal effect with respect to the respondent employer, it is necessary to determine whether that section, by its terms, i.e., the prohibition of religious discrimination, mandates that an employer make affirmative accommodations for the religious needs of its employees. Therefore, in light of the various intrinsic and extrinsic aids to construction of statutory provisions, we are required to decide whether the FEPA prohibition against religious discrimination in employment practices includes a duty reasonably to accommodate the religious needs of an employee. We hold that it did not, for the following reasons.

## DISCUSSION

As noted above, the Civil Rights Commission

[5] Of course, we recognize that if the language of a statute is ambiguous, the interpretation given to it by the administrative agency charged with carrying out the will of the Legislature is entitled to careful consideration by the courts, but such administrative interpretation is not binding on the courts and must be rejected if not in accord with the intention of the Legislature. *Consumers Power Co v Corporation & Securities Comm*, 326 Mich 643; 40 NW2d 756 (1950). See generally, 22 Callaghan, Michigan Civil Jurisprudence, Statutes, § 141; 21 Michigan Law & Practice, Statutes, § 89, p 93, text at fn 13.

followed the lead of the Federal government in issuing its interpretative guideline dealing with religious accommodation in employment practices. Likewise, we find it useful to examine Federal precedent in this area for two reasons. First, Federal law provides a good general source for interpreting state civil rights legislation because of the great number of decided cases. See *Beech Grove Investment Co v Civil Rights Comm,* 380 Mich 405, 419; 157 NW2d 213 (1968). Second, we look for guidance to the Federal courts, because they have addressed the precise issue raised on appeal.

In 1964, Congress enacted the Civil Rights Act of 1964, which, in pertinent part, § 703(a), contained language substantially identical to § 3a of the FEPA:

"(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 USC 2000e-2.

In 1966, the Equal Employment Opportunity Commission (EEOC) issued guidelines that declared that an employer was required "to accommodate to the reasonable religious needs of employees * * * where such accommodation can be made without serious inconvenience to the conduct of the business". 29 CFR § 1605.1 (1967). In 1967,

the EEOC amended the guidelines by interpreting § 703(a) of the Civil Rights Act of 1964 as imposing a duty on an employer "to make reasonable accommodation to the religious needs of employees and prospective employees where such accommodations can be made without unique hardship on the conduct of the employer's business". 29 CFR § 1605.1 (1968). It was this latter interpretation that was later adopted by reference by the Michigan Civil Rights Commission on September 26, 1972. The guidelines, as issued by the EEOC or as adopted by the Michigan Civil Rights Commission, failed to define the terms "reasonable accommodation" and "undue hardship".

When, in the course of events, the EEOC attempted to enforce these guidelines against employers charged with failing to accommodate the religious needs of their employees, the guidelines were challenged as imposing upon the employers a duty which exceeded the mandates of § 703(g) of the Civil Rights Act of 1964, and therefore, being invalid. The sixth circuit court of appeals agreed with the challengers in the case of *Dewey v Reynolds Metals Co,* 429 F2d 324, 334-5 (CA 6, 1970). There, the court held that religious discrimination could not be equated with a duty to accommodate. The court stated:

"Nowhere in the legislative history of the Act do we find any Congressional intent to coerce or compel one person to accede to or accommodate the religious beliefs of another. The requirement of accommodation to religious beliefs is contained only in the EEOC Regulations, which in our judgment are not consistent with the act." 429 F2d at 334.

The United States Supreme Court affirmed the *Dewey* decision by an equally divided vote. *Dewey*

*v Reynolds Metals Co,* 402 US 689; 91 S Ct 2186; 29 L Ed 2d 267 (1971). A like decision was rendered in *Kettell v Johnson & Johnson,* 337 F Supp 892, 895 (ED Ark, 1972).

In direct response to the *Dewey* decision,[6] Congress amended Title VII of the Equal Employment Opportunity Act of 1972 (701j) to include the requirement of reasonable accommodation:

"The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 USC 2000e(j), Pub L 92-261 § 2(7) (Effective March 24, 1972).

Following this enactment, most of the Federal circuit courts passing on the question, including the sixth circuit, concluded that *this subsequent congressional affirmation of the EEOC guidelines* validated them. See *e.g., Riley v Bendix Corp,* 464 F2d 1113 (CA 5, 1972), *Reid v Memphis Publishing Co,* 468 F2d 346 (CA 6, 1972), *Yott v North American Rockwell Corp,* 501 F2d 398 (CA 9, 1974), *Cummins v Parker Seal Co,* 516 F2d 544 (CA 6, 1975), *aff'd by equally divided court,* 429 US 65; 97 S Ct 342; 50 L Ed 2d 223 (1976) and see generally Anno: *Validity, Construction, and Application of Provisions of Title VII of Civil Rights Act of 1964*

[6] The 1972 amendment to Title VII of the Equal Employment Opportunity Act of 1972 was initiated to address the questions raised in *Dewey.* Senator Jennings Randolph, a sponsor of the amendment, made reference to the Supreme Court's equally divided decision in *Dewey* and then stated:

"This amendment is intended in good purpose to resolve by legislation—and in a way I think was originally intended by the Civil Rights Act—that which the courts apparently have not resolved." 118 Cong Rec 704-713, 7167 (1972). See 4 Larsen, Employment Discrimination, § 92.10 (1978).

*(42 USCS §§ 2000e et seq.) and Implementing Regulations, Making Religious Discrimination in Employment Unlawful,* 22 ALR Fed 580, § 4(b), 15 Am Jur 2d, Civil Rights, § 195, p 705, but see *Reid v Memphis Publishing Co,* 521 F2d 512 (CA 6, 1975). This interpretation was adopted by a unanimous United States Supreme Court where, after reviewing the legislative history of the religious accommodation provision, it ruled that the EEOC guidelines were

"at least sufficient in this case to warrant our accepting the guideline as a defensible construction of the pre-1972 statute". *Trans World Airlines, Inc v Hardison,* 432 US 63, 76, fn 11; 97 S Ct 2264; 53 L Ed 2d 113 (1977).

In the case at bar we are asked to adopt a similar construction of § 3(a) of the FEPA based on the rationale used by the Supreme Court in *Hardison.* This we cannot do. First, we are not presented, as was the Court in *Hardison,* with a situation in which the legislative body subsequently enacted legislation expanding the prohibition against religious discrimination to include a duty to make reasonable accommodations. Unlike Congress, the Michigan Legislature remained silent following the 1970 decision in *Dewey* and the Supreme Court's affirmance, by a split decision, in 1975. Therefore, in the absence of any clear legislative interpretation that the term "discrimination" in the FEPA included a duty to make reasonable accommodations, we rule that such a construction goes beyond the legislative mandate set forth in § 3(a) of the FEPA.

Second, not only did the Legislature fail to enact positive legislation addressing the issue of religious accommodation but, on three occasions, when it

had the opportunity to so amend the statute, it chose not to. 1972 PA 267, effective October 5, 1972, amended the title and added § 3a (not to be confused with § 3[a]) dealing with age and sex discrimination. In 1975 PA 332, effective January 12, 1976, the title was again amended and § 3 amended to preclude the use of arrest records in employment practices. 1976 PA 52, effective March 22, 1976, again amended the title and § 3(a) of the FEPA to prohibit discrimination on the basis of height, weight or marital status. None of the three amendments, all enacted after the adoption of defendant commission's interpretive guidelines, dealt with the religious accommodation issue.

A third reason we cannot by judicial ruling write into the FEPA a duty to accommodate is the long-standing reluctance of this Court and the sixth circuit court of appeals to find affirmative duties in a general ban on discrimination. In *Dewey, supra,* the sixth circuit court of appeals said:

> "The fundamental error of *Dewey* and the Amici Curiae is that they equate religious discrimination with failure to accommodate. We submit these two concepts are entirely different. The employer ought not to be forced to accommodate each of the varying religious beliefs and practices of his employees." *Dewey, supra,* at 335.

On two occasions this Court has declined to find affirmative duties mandated within a statute which forbids "discrimination". In *Civil Rights Comm v Chrysler, supra,* we held that unless there was a showing that failure to provide special training constituted dissimilar treatment, § 3 of the FEPA did not mandate that the employer provide such special training. More recently, in *Dady v*

*Rochester School Board,* 90 Mich App 381; 282 NW2d 328 (1979), this Court examined the nondiscrimination provisions of the Handicappers' Civil Rights Act, MCL 37.1101 *et seq.;* MSA 3.550(101) *et seq.,* and the Elliott-Larsen Civil Rights Act. Despite more specific language as to affirmative duties in the Handicappers Act than in the Civil Rights Act, the Court held that, while the statute prohibited a school from discriminating against handicapped children, the statute did not include the obligation to provide a medical service without which the child could not attend the special education program. See also, *Highland Park v Fair Employment Practices Comm,* 364 Mich 508, 513-514; 111 NW2d 797 (1961).

The Department of Civil Rights vigorously argues that because the Legislature, being well aware of the commission's "interpretive guidelines" extant since September 26, 1972, did not write an accommodation requirement into the comparable section of the Elliott-Larsen Act, which repealed and replaced the FEPA, such fact evidences legislative acquiescence in the long-standing interpretive guideline. It is further argued that repeated legislative enactment in substantially identical terms of legislation which has been subject to long-standing judicial or administrative interpretation indicates approval of the administrative interpretation. *In re Martiny Lakes Project,* 381 Mich 180, 195; 160 NW2d 909 (1968), *Magreta v Ambassador Steel Co,* 380 Mich 513, 519-520; 158 NW2d 473 (1968).

The flaw in the above argument is that while such may have been true in 1977, when Elliott-Larsen was enacted, it certainly was not true in October, 1972, when claimant's employment was terminated. The guidelines were not in effect when

claimant refused to work on Friday, September 22, 1972, and had only been in effect for 3 and 10 days respectively when claimant missed work on the following two Fridays. Further, the controlling law at that time was the sixth circuit's opinion in *Dewey, supra,* which was decided June 4, 1970, and affirmed by the Supreme Court June 1, 1971. *Hardison, supra,* was not decided until June 16, 1977. Thus none of the four main factors upon which the courts rely to give authoritative effect to interpretive rules are present here. They include:

"* * * special expertise of the agency combined with lack of expertise of the court, reenactment of the statute in circumstances which indicate legislative approval of the rules, contemporaneous construction (interpretations at the time of the enactment by administrators who were especially informed of the legislative intent), and longstanding rules." Davis, Administrative Law Text (3d ed), p 127.

The controlling legislative intent is that which pertained at the time the alleged offense occurred, rather than the legislative intent as of the date of a subsequent enactment. *Detroit Edison Co v Dep't of Revenue,* 320 Mich 506, 519; 31 NW2d 809 (1948), *Iron Street Corp v Unemployment Compensation Comm,* 305 Mich 643, 655; 9 NW2d 874 (1943), see generally, 21 Michigan Law & Practice, Statutes, § 97, p 108. Accordingly, we hold that proscription in the FEPA not to discriminate as to religion did not include a duty to accommodate.

This holding does not extend to situations involving violations occurring under the Elliott-Larsen Civil Rights Act.[7] When that statute was enacted January 13, 1977, the interpretive guideline had been in effect for more than four years. Obvi-

---

[7] See footnote 1, *supra.*

ously, a stronger case for the application of the acquiescence in administrative interpretation rule, as laid down in *Magreta,* exists under the Elliott-Larsen statute than under the repealed FEPA. However, strong arguments can be advanced for a contrary interpretation,[8] and therefore we do not decide the issue but leave it for future decision under the applicable statute.

## CONCLUSION

In light of the various considerations discussed above, we conclude that the FEPA did not impose an obligation on the employer to make affirmative accommodations to conform to the employee's religious needs. Our resolution of this question makes it unnecessary to consider the other issues raised by both parties on appeal. The decision of the circuit court reversing the order of the Civil Rights Commission is affirmed. All charges brought against the respondent herein are dismissed. Const 1963, art 6, § 28, MCL 24.306; MSA 3.560(206), *Dixon v Ford Motor Co,* 402 Mich 315; 262 NW2d 666 (1978).

No costs, a public question being involved.

---

[8] While the Legislature expressly required accommodation by employers when it enacted the Handicappers' Civil Rights Act, 1976 PA 220, effective March 31, 1977, MCL 37.1101 *et seq.;* MSA 3.550(101) *et seq.,* it failed to include an accommodation provision when it enacted the Elliott-Larsen act in January, 1977. Since both acts carried the same effective date, and the one contained an express provision and the other did not, it can be argued that the Legislature intentionally declined to write into the statute the obligation to accommodate.