Donald SHAW and Donna Moore Shaw, his wife, Plaintiffs,

v.

Victor L. CASSAR, Victor L. Cassar Management Company, Assunta Cassar, Victor P. Cassar, David Cassar, Albert L. Cassar, Daniel V. Cassar, Virginia M. Cassar and Frank J. Cassar, Defendants.

Civ. No. 81–73769.

United States District Court, E.D. Michigan, S.D.

Jan. 7, 1983.

actively participated in the events in question.

Shaw and Moore charge in their complaint that they rented an apartment on April 14, 1981 from defendants and were effectively evicted from it on April 16, 1981 when, in part because they are black, Frank Cassar changed the lock on their apartment at Victor Cassar's direction.

Defendants deny that the change in the lock on the apartment was motivated by any racial animus; rather they say it was simply an overreaction to the fact that Moore's check for the security deposit was improperly made out and that Shaw's check for the first month's rent was written without sufficient funds in his bank account to cover it. Defendants do not seriously dispute the claim that they violated the anti-lockout law. Also, defendants do not dispute their joint liability for the actions of Victor Cassar and Frank Cassar.

David K. Wenger, Detroit, Mich., for plaintiffs.

Terrence K. Jolly, Bloomfield Hills, Mich., for defendants.

## OPINION

COHN, District Judge.

## I. INTRODUCTION

### A.

This is a housing discrimination case brought under 42 U.S.C. § 1981 (the Civil Rights Act of 1870), 42 U.S.C. § 1982 (the Civil Rights Act of 1866), 42 U.S.C. § 3601 et seq. (Title VIII of the Civil Rights Act of 1968, "Title VIII"), M.C.L.A. § 37.2101 et seq. (the Michigan Elliot-Larsen Civil Rights Act) and M.C.L.A. § 600.2918(2) (the Michigan anti-lockout law).[1]

Plaintiffs Donald Shaw (Shaw), a Detroit police officer, and Donna Moore Shaw (Moore), an office worker, are husband and wife. They were engaged to be married at the time of the events in question; they are each black.

The individual defendants are white; they own and operate a 39 unit apartment building at 660 Whitmore Road in Detroit's Palmer Park area under the name Victor L. Cassar Management Company.[2] The building is well kept and located in a highly desirable residential neighborhood. Defendants Victor Cassar and Frank Cassar

### B.

For the reasons hereafter stated, which constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a), I find that the charges of racial discrimination and of violation of the anti-lockout law are well taken. I find that Shaw was damaged in the amount of $10,000 and that Moore was damaged in the amount of $10,-000. I also find that an award of punitive damages in the amount of $5,000 to Shaw and an award of punitive damages in the amount of $5,000 to Moore is appropriate.

## II. TRIAL

The case was tried to the bench over seven days in October 1982. Liability and damages were tried separately, Fed.R.Civ.P. 42(b). Shaw and Moore each testified as to liability and damages. Also testifying in plaintiffs' case on liability were Mary Alvarez (Alvarez) and Clifford Schrupp, director of the Fair Housing Cen-

---

1. The Court has pendent jurisdiction over the state law claims. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

2. Mary Alvarez, the manager of the building, was named as a defendant in the complaint. She was dismissed from the case at the conclusion of the proofs.

ter, a non-profit organization which has as its corporate purpose promotion of equal opportunity in housing. Moore's brother, a co-worker of Shaw, and a co-worker of Moore each testified in plaintiffs' case on damages. Plaintiffs introduced into evidence as exhibits checks, the rental application, a card posted on the apartment door on April 16, test reports from the files of the Fair Housing Center, and a Detroit Edison Company bill.

Victor Cassar was the only witness who testified for defendants. Frank Cassar, while listed by both parties as a witness, was not called. Defendants introduced into evidence bank statements of Shaw and Moore for February, March and April of 1981.

## III. FINDINGS

### A.

The findings which follow are based on my assessment of the credibility of the witnesses and the weight I have given the testimony and exhibits. In assessing the credibility of the witnesses I looked for corroboration and their motive for testifying. I have drawn certain inferences from admissions and proven facts as will subsequently be discussed. I have also considered the parties' briefs and oral arguments.

### B.

I find:

1. Sometime prior to April 7, 1981 Shaw and Moore were engaged to be married and began looking for an apartment. Shaw was particularly attracted to 660 Whitmore because it was a well kept building close to his place of work (the Palmer Park police station) and located in one of Detroit's better neighborhoods. Periodically Shaw would stop by the building and inquire of Alvarez as to the availability of an apartment. About a month before April 7 in the course of his work he met Frank Cassar at another apartment building in the Palmer Park area owned by defendants and asked him about the possibility of renting an apartment at 660 Whitmore; Frank Cassar gave him a favorable response. Frank Cassar told Victor Cassar of his conversation with Shaw. Victor Cassar knew Shaw was black.

2. Alvarez reacted favorably to Shaw's inquiries; she liked the idea of a police officer living at 660 Whitmore. On April 7, Shaw and Moore made out a rental application for apartment 302 (Px1), which had recently become vacant because of the death of its occupant. Moore, at Alvarez's request, gave Alvarez a check as a security deposit (Px2), for which she received a receipt (Px3) in the amount of $385 which was the monthly rental. There was a discrepancy on the check between the numerical amount, "$385" and the written amount, "three hundred ____ 85/100". Alvarez did not notice the discrepancy.

3. Alvarez had no authority to approve new tenants; that was the responsibility of Victor Cassar and Frank Cassar. On April 7 or April 8 Alvarez gave the security deposit check and rental application to Victor Cassar who, remembering Frank Cassar's mention of Shaw, simply put the rental application and check in his pocket. A day or so later he told Frank Cassar of the rental application. Frank Cassar said to go ahead and rent Shaw and Moore the apartment. Victor Cassar told Alvarez that Shaw and Moore were approved as tenants but that their rent should begin April 15 rather than May 1 as they requested.

4. On April 10 Alvarez told Moore the rental application had been approved but the rent must begin April 15 rather than May 1. On April 14 Shaw and Moore went to 660 Whitmore. Shaw gave Alvarez a check (Px5) dated April 15, 1981, in the amount of $385 for the first month's rent for which he received a receipt (Px6) dated April 14. Alvarez gave Shaw and Moore four sets of keys, i.e., to the front door of the building, mailbox, apartment # 302 and the garage. Shaw and Moore immediately began getting the apartment ready for occupancy. That evening and the next day Shaw and Moore worked in the apartment. They brought over cleaning supplies and some miscellaneous items. Shaw's two

children visited the apartment. Moore's brother spent several hours there on April 15. On April 15 Shaw went to the Detroit Edison Company and had the electric bill changed to his name as suggested by Alvarez.

5. Between April 7 and April 14 Shaw showed the apartment to two of his fellow police officers. Shaw and Moore told their friends and co-workers that they had a new apartment at 660 Whitmore. It was an important event in their lives; they were quite proud of the fact that they would be living in the Palmer Park area. Moore told the landlord of the apartment building in which she lived she would be moving around May 1.

6. On April 15, as was his practice, Victor Cassar gave Virginia Cassar, who handled the books for defendants, the rental application and security deposit check. Virginia also received the first month's rent check which Shaw had given Alvarez on April 14. Virginia Cassar's office was in Farmington Hills. Virginia Cassar has no personal recollection of any of the facts of the case.

7. On April 16 Shaw went to the apartment to get it ready. When he put his key in the door it would not work. He was surprised; he saw on the door a note (Px7) reading:

"Dear Sir:
Please Contact
Mr. Cassar—861–5010
—Please       Do Not
Disturb the Manager
About this matter,
I Didn't Inform her
About what's going on.
   V. Cassar" [3]

8. Shaw went back to Moore's apartment, which was across the street, and told her about the lock problem. She could not believe it. She went across the street to the apartment to make sure Shaw had not made a mistake. She too found their key would not work. She returned to her apartment where Shaw was waiting for her.

9. Shaw and Moore were confused and distressed; they immediately tried to call Victor Cassar at the number on the note. There was no answer. Shaw eventually reached Victor Cassar at 5:30 a.m. on April 17 at a number he found in the telephone book. Victor Cassar told him of the discrepancy in the security deposit check and that the bank said there were no funds to cover the check he had given Alvarez for the first month's rent. Shaw told Victor Cassar that there must be some mistake because there was money in the bank to cover his check. He asked Victor Cassar to go to the bank with him that morning so he could demonstrate that the bank made an error. Victor Cassar declined; he told Shaw that Frank Cassar was handling the matter, that Shaw should talk to Frank Cassar, and that Frank Cassar would get back to Shaw. Shaw also testified that Victor Cassar told him that he had no business getting the apartment and that Alvarez was not supposed to give it to them; Victor Cassar denied saying this. It is probable Victor Cassar said something like this.

10. Frank Cassar called Shaw about 11:00 a.m. and told him that Victor Cassar made the decisions, that he would talk to Victor Cassar and that he would call Shaw back.

11. Neither Victor Cassar nor Frank Cassar thereafter called Shaw back. It is not clear who actually made the decision not to accept Shaw's offer to go to the bank. More than likely Victor Cassar made the decision.

12. Later in the day Shaw and Moore called Alvarez. She told Shaw she had never seen Victor Cassar so angry and that she had an envelope with the checks which she would give him when he returned the keys. Shaw and Moore were resigned to the loss of the apartment. Shaw and Moore went to 660 Whitmore where, after returning the keys, Alvarez gave them the items and cleaning materials they had previously taken to the apartment.

---

**3.** A copy of the notice is attached as Appendix A.

13. Alvarez knew nothing of the events of April 16. Neither Victor Cassar nor Frank Cassar discussed with Alvarez the matter of the checks, the change of the lock or the removal of anything from the apartment. All Alvarez knew was that the cleaning materials and items in the apartment had been taken to the basement by someone.

14. Over the next several days Shaw and Moore had to tell their friends and co-workers they no longer had the apartment and that they had been locked out of it. They were embarrassed and humiliated by the experience. It took them some time to recover from the emotional stress caused by the lockout. On April 21, 1981 Shaw went to the Detroit Edison Company and took his name off the account. The Detroit Edison Company billed Shaw $8.01 for electric usage for the period April 15 to April 21, 1981, which he paid. (Px12).

15. After April 17 Moore found it necessary to go back to her landlord and make arrangements to continue to rent her apartment.

16. As a result of their experience and because of a change in their desires Shaw and Moore decided to buy a house instead of renting an apartment. In November 1981 they began looking for a house which they eventually purchased towards the end of 1981.

17. Virginia Cassar's work for defendants includes posting the receipt of security deposits and monthly rent checks as well as making up the bank deposits. Customarily when she receives a security deposit check or a rent check which is not in order, or, in her words, "funny", she calls the bank to determine if the check is good. The bank usually responds by advising her if the account has sufficient funds; if the account does not have sufficient funds the usual response from the bank is to the effect that the account lacks funds to cover the check. She is not told the exact balance. If she is told the account lacks sufficient funds to cover a check, she then contacts the tenant and requests a money order to cover the rent. If the money order is not forthcoming she then gives the tenant a seven day notice to quit. It was not clear whether Virginia Cassar ever verifies the information given by the bank over the telephone by actually depositing the check. Virginia Cassar and Victor Cassar were both aware of the possibility of a check being rejected because funds in an account are uncollected. The rental application contains express provisions relating to returned checks and the like which act as incentives encouraging prompt payment.

18. On April 15 or April 16 Frank Cassar told Victor Cassar of the discrepancy in the security deposit check and that the bank said Shaw's account did not have sufficient funds to cover the first month's rent check. Apparently Frank Cassar got this information from Virginia Cassar.

19. Victor Cassar became very angry when he heard of the check problem. Victor Cassar testified that his experiences as a landlord told him that when a first month's rent check or security deposit check was not good it meant the tenant "would be trouble". Victor Cassar told Frank Cassar to change the lock on the apartment and post a note for Shaw to call him. Victor Cassar testified he did this to avoid the delay and expense involved in going to court.

20. Victor Cassar did not know exactly who changed the lock or wrote the note. Before telling Frank Cassar to change the lock Victor Cassar said he tried to reach Shaw at work. When he could not reach Shaw, Victor Cassar did not call Shaw's superior because, he said, he did not want to embarrass Shaw. A police officer who writes a bad check faces serious disciplinary problems. However, there is no evidence that Victor Cassar knew this.

21. Victor Cassar is an experienced landlord and is fully familiar with the procedures to be followed in evicting a tenant. He is involved in approximately 500 evictions a year.

22. Victor Cassar's version of the April 17 early morning phone call with Shaw is somewhat different than Shaw's. Victor Cassar explained it as follows:

Q. Did there come a point in time when you received a phone call from Mr. Shaw the 16th of April?

A. It was approximately four—between four and four thirty in the morning.

Q. Well, he asked you about why the locks were changed in the door, is that correct?

A. I told him that we changed the locks because neither one of his checks were any good. The check for the rent was no good and the check for the security deposit was written incorrectly.

Q. And what was the response?

A. I think he offered to go—he did offer to go to the bank with me to make the checks good in the morning.

Q. And what was your response to that?

A. I told him I'd just rather not do that, but just turn the keys in and give him back his checks, and I'd have to take the apartment back.

Q. I mean, why, what was the rationale for that? Why did you want to forget about the whole transaction?

A. ... I'd rather just get my keys back and give you back your checks.

Q. (By Mr. Wenger, continuing): And did he respond after that?

THE COURT: Did he agree to that?

A. No. I told him that I would discuss it with Frank. And, like I said, it was four thirty in the morning and I more or less jumped out of bed and that was it. It was some time ago. I mean exactly what I told him, I can't quite remember. But I know that he did offer to go to the bank with me to make the checks good, which I told him I'd get back with him later in the day, me or Frank, and to let him know what we decided on. but I told him I—no. I told him, as far as I'm concerned, there's no way that I'm going to rent you an apartment, that I want to go to the bank and make these checks good.

Q. Even after he offered to go make them good?

A. That's right. And then I explained to him that in the past whenever I got—usually that first month's check back or a security deposit check back, that all I had was trouble, starting court cases and going back into court and wasting a lot of time and expense. And as far—if it was up to me, there was no way that I would go to the bank with him. And I told him I would discuss it with Frank and then we'd decide what would happen.

Q. Did you tell him to wait until—that somebody would be calling him back?

A. That's correct.

Q. And so, did you have a conversation with Frank after that?

A. Yes, I did.

Q. And what time was that?

A. It was sometime during the day.

Q. And what was the result of that conversation?

A. I think we decided—I can't remember offhand. I'm more or less guessing. Do you want me to guess or just say I can't remember.

THE COURT: You had a conversation with Frank?

A. Yes, I did.

THE COURT: All right. What did you conclude after the conversation? Did you reach an agreement with Frank on what you were going to do?

A. Yes. That he'd be given back his money, that we will not rent him the apartment.

Q. (By Mr. Wenger, continuing): And what was the rationale for that decision, after talking to Frank? Was it something Frank said to you that made you decide there was no reason to change your mind?

A. No, I think I changed Frank's mind.

Q. Well, why did you change Frank's mind?

A. Well, he knows, as well as I do, he goes to court on just as many cases as I

do in the Landlord Tenant Court for people for not paying their rent, and this looked like a regular routine case of continuing going to court for non payment of rent. So right then and there, as far as I was concerned, I didn't think Mr. Shaw would be a desirable tenant for paying his bills or paying his rent on time. And I think I more or less influenced Frank to just don't go to the bank and just tell Mr. Shaw that he can't have the apartment. Take the keys back, pick up his checks.

. . . . .

Q. When was the next time you talked to him again, if any?

. . . . .

A. I don't think I've ever talked with him after that.

. . . . .

Q. . . . Weren't ·you concerned about that? [Whether the apartment was vacant or furnished] Wouldn't that have made a difference in your mind?

A. Well, I know that if Frank went up there to change the locks, and the apartment was furnished, I know Frank's got better sense than to try and pull something like that. Try and pull a stunt like that." [4]

23. While defendants attempted to establish through Moore's bank statements (Dx17, Dx18) and her testimony that the security deposit check was not good and that Moore had a habit of writing checks against insufficient funds, it appears that had Moore's check been written correctly it would have cleared her bank. There was no evidence that Moore deliberately made out the check incorrectly or that Virginia Cassar or anyone else checked with Moore's bank or checked the credit references given by Moore on the rental application.

24. While defendants attempted to establish through Shaw's bank statements (Dx11, Dx12, Dx13, Dx14) and his testimony that the first month's rent check was not good, it appears that a deposit made by Shaw in his bank account on April 15 was not posted until April 16. Thus had the check been deposited in the regular course of business, it would have cleared. Likewise it appears that had Victor Cassar gone to the bank with Shaw as Shaw asked him to on April 17, Victor Cassar would have found that Shaw's check was good. There is no evidence that Mary Cassar or anyone else checked the credit references given by Shaw on the rental application. There is no direct evidence that Virginia Cassar checked with Shaw's bank.

25. When Shaw and Moore received the various keys from Alvarez on April 14, they were given possession of the apartment and became tenants of defendants. Changing the lock was an extraordinary occurrence; in her 35 years of experience as an apartment manager Alvarez had never heard of it being done before. There was no evidence that Victor Cassar had ever changed a lock on a tenant's apartment before.

26. There was arguably relevant evidence of race discrimination in the rental of apartments at 660 Whitmore. The results of two sets of test inquiries as to the availability of apartments at 660 Whitmore in March and early April 1981, sponsored by the Fair Housing Center (Px8, Px9), indicate race discrimination. A different white tester on each occasion was treated more favorably by Alvarez than the same black tester. However this evidence is entitled to little weight because plaintiffs failed to establish that Alvarez knew the race of the black tester. The inquiries were conducted over the lobby intercom; the reports of the black tester do not disclose a face-to-face interview with Alvarez.

27. There was no evidence as to the racial mix of the tenants at 660 Whitmore except the testimony of Alvarez and Victor Cassar; each thought there were 3 or 4 black tenants in April 1981 and approximately the same number for around the last several years. A basement apartment was rented to a black person in March 1981. Apartment # 302 was shown to the white tester in the April 1981 test.

4. Excerpt from the testimony of Tuesday, October 26, 1982.

28. Early in May 1981 apartment # 302 was rented to a white family.

## IV. VIOLATION OF THE ANTI–LOCKOUT LAW

■ Shaw and Moore clearly proved a violation of the anti-lockout law.[5] M.C.L.A. § 600.2918(2) reads in relevant part:

Any tenant in possession of premises whose possessory interest has been unlawfully interfered with by the owner, lessor, licensor, or their agents shall be entitled to recover the amount of his actual damages or $200.00 whichever is greater, for each occurrence and, where possession has been lost to recover possession. Unlawful interference with a possessory interest shall include:

(c) A change, alteration, or addition to the locks or other security devices on the property without forthwith providing keys or other unlocking devices to the person in possession.

As explained in a legislative analysis preceding enactment:

At present, section 2918 of the Revised Judicature Act [i.e. M.C.L.A. 600.2918(1)] prohibits a landlord from ejecting in a forcible and unlawful manner a person who is in possession of property. This prohibition has generally been construed by the courts to mean that force or threat of force must be directed against the person in possession, and not merely against the property (*Shaw v. Hoffman,* 1872, 25 Mich. 162). As such, the changing of locks, the termination of utilities, or the boarding of doors is not considered an illegal method of obtaining possession. Some persons believe that not only force, but any device which prevents a tenant from enjoying peaceful possession of the property which he/she possesses, should be deemed unlawful.

.       .       .       .       .

Unlawful interference with a possessory interest would have occurred if: ... (3)

locks were changed or added without providing keys, to prevent peaceful possession;

.       .       .       .       .

Under the bill, persons who lose possession or have their possessory interests interfered with, could go to circuit court with an action for possession, a claim for injunctive relief, and/or a claim for damages. Any action taken under the bill's provisions to regain possession of premises would have to be started within 90 days from the time the cause of the action arose or became known to the plaintiff. An action for damages would have to be started within 1 year form this time.

The provisions of this bill could not be waived.[6]

Victor Cassar directed Frank Cassar to do what the anti-lockout law forbids and either Frank Cassar or someone at his behest did just that: the lock on apartment # 302 was changed without providing keys to Shaw and Moore, the tenants in possession.

■ The only question open is the determination of Shaw and Moore's actual damages. Actual damages in Michigan, particularly when an intentional wrong is involved, as is the case here, include damages for emotional stress, embarrassment and humiliation. *Ray v. Detroit,* 67 Mich.App. 702, 242 N.W.2d 494 (1976); *Wronski v. Sun Oil Co.,* 89 Mich.App. 11, 27, 279 N.W.2d 564 (1979). Accordingly, Shaw and Moore are entitled to damages for the emotional stress, embarrassment and humiliation they suffered as a result of the lock-out.

## V. VIOLATION OF THE FAIR HOUSING LAWS

### A.

■ As described in 42 U.S.C. § 3601, the purpose of Title VIII is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3604(a) makes it unlawful:

---

**5.** Defendants do not assert that any of the exceptions contained in M.C.L.A. § 600.2918(3) apply.

**6.** Third Analysis—H.B. 4957 (12–22–76). (House Legislative Analysis Section).

"To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin."

42 U.S.C. § 1982 says:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

A finding that defendants have violated Title VIII and § 1982 under these facts entails likewise a finding that they have violated the prohibition of 42 U.S.C. § 1981 against racial discrimination in the making of contracts, *Marable v. H. Walker & Assoc.,* 644 F.2d 390, 395 n. 16 (5th Cir.1981), and the Michigan Elliot-Larsen Civil Rights Act which provides:

"A person engaging in a real estate transaction ... shall not on the basis of ... race ... [d]iscriminate against a person in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith."

M.C.L.A. § 37.2502(1)(b). *See Department of Civil Rights v. General Motors Corporation,* 93 Mich.App. 366, 375, 287 N.W.2d 240 (1979) (Michigan courts will look to interpretation of federal civil rights acts in applying Elliot-Larsen). Because Title VIII and § 1982 afford complete relief for plaintiffs' fair housing claims, legal analysis shall proceed only as to Title VIII and § 1982.

■ The three-part burden of proof test established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a Title VII employment discrimination case, has been widely applied to Title VIII and § 1982 claims. *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032 (2nd Cir.1979) (Title VIII); *Phiffer v. Proud Parrot Motor Hotel, Inc.,* 648 F.2d 548, 551 (9th Cir.1980) (§ 1982). *See also Harper v. Hut-*

*ton,* 594 F.2d 1091 (6th Cir.1979) (both Title VIII and § 1982). Shaw and Moore made out a *prima facie* case [7] by showing:

1. they are members of a racial minority;

2. they rented an apartment from defendants;

3. they were evicted, i.e. locked out of their apartment; and

4. the apartment continued to be available and was subsequently rented to a white family.

With these proofs in place, the burden then shifted to defendants to produce evidence that the self-help eviction was motivated by legitimate non-racial considerations. As explained in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981):

"The burden that shifts to the defendant, therefore, is the burden to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected ... for a legitimate, non-discriminatory reason.

.    .    .    .    .

To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reason for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity."

■ Once defendants articulated their allegedly non-discriminatory reasons, the burden shifted back to plaintiffs to show that these proffered reasons were pretextual, thus merging with plaintiffs' ultimate burden of persuading the Court that they had been victims of intentional discrimination. *Id.* at 256. Although plaintiffs retain at all times the ultimate burden of persuasion,

7. Walker's, *The Oxford Companion To Law* (New York 1980) explains the meaning of a prima facie case as "a case sufficient to call for an answer."

the inference of discrimination arising from the elements of the *prima facie* case remains relevant:

"In saying that the presumption [of discrimination] drops from the case, we do not imply that the trier of fact may no longer consider evidence previously introduced by the plaintiff to establish a prima facie case. A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation."

*Id.* at 255 n. 10, 101 S.Ct. at 1095 n. 10.

A finding that defendants' "legitimate business reasons" are not credible can thus be sufficient to carry the day for a civil rights plaintiff. As explained by Justice Rehnquist in *Furnco Construction Corp. v. Walters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (cited with approval in *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094), the *McDonnell Douglas* inference of discrimination is based on the common sense conclusion that an inadequately explained adverse action is more likely than not based on impermissible factors:

"A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. *See Teamsters v. United States, supra,* [431 U.S. 324] at 358 n. 44 [97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977)]. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's ac-

tions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race."

■ Defendants' reasons must be examined keeping in mind that the fair housing laws "prohibit all forms of discrimination, sophisticated as well as simpleminded, and thus disparity of treatment between blacks and whites, burdensome application procedures, and tactics of delay, hindrance and special treatment must receive short shrift from the courts". *McDonald v. Verble,* 622 F.2d 1227, 1234 (6th Cir.1980), *quoting Williams v. Matthews Co.,* 499 F.2d 819, 826 (8th Cir.), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). Racial animus need not have been the sole reason for the eviction; defendants are liable so long as race played a part in their decision. *Jordan v. Dellway Villa of Tenn., Ltd.,* 661 F.2d 588, 594 (6th Cir.1981); *Woods-Drake v. Lundy,* 667 F.2d 1198, 1201 (5th Cir.1982). The Court's inquiry must be especially probing where defendants' explanation rests on reasons that are not objective:

"[T]he courts have generally viewed subjective explanations with considerable skepticism. The wisdom in such skepticism is obvious. '*Any* defendant can respond to a discriminatory effect with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case'. Comment, *Applying the Title VIII Prima Facie Case to Title VIII Litigation,* 11 Harv.C.R.–C.L.L.Rev. 128, 182 (1976) (emphasis in original)."

*Robinson,* 610 F.2d at 1040. *See also Phillips v. Hunter Trails Community Association,* 685 F.2d 184 (7th Cir.1982); *Harper, supra.*

### B.

■ Defendants rely entirely on Victor Cassar's explanation that he believed Shaw and Moore would not be good tenants and simply wanted to avoid the time and expense of following the procedures required

by law. I find this explanation insufficiently credible to overcome the inference of discrimination arising from defendants' extraordinary treatment of Shaw and Moore. Much of this credibility determination is based on the same common sense evaluation of human behavior that a jury would engage in, C. Wright & A. Miller, 9 *Federal Practice & Procedure* § 2586 at 736–37 (1971).

"Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them."

*United States v. Yellow Cab Co.*, 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).

Several factors in particular determine the credibility of Victor Cassar's explanation:

1. Victor Cassar is a very experienced landlord; defendants are in the business of renting apartments. Michigan law is explicit regarding the procedures to be followed in recovering possession of rental premises, M.C.L.A. § 600.5701 *et seq.*, Mich. District Court Rule 754, and as to the illegality of the self-help method used by defendants, M.C.L.A. § 600.2918(2). Many of defendants' tenants were late in making rent payments; they had procedures for dealing with the problem explicitly recognized in the rental application. They also had established procedures for dealing with checks that were "funny" or written on insufficient funds. None of these procedures entailed locking the tenants out of their apartment. Defendants made no showing that they had ever before in their extensive real estate dealings treated tenants as they treated Shaw and Moore.

2. Defendants produced no direct evidence that either check was or would have been dishonored by the bank. The inconsistency on the face of Moore's security deposit check was a rather obvious simple error, not an attempt to avoid payment of the full amount. As for Shaw's check, there was no clear evidence as to the source of Frank Cassar's belief that the check was drawn on insufficient funds and no direct evidence that the bank so informed defendants.

3. Although defendants listed Frank Cassar as a witness, they did not call him. Because defendants could readily have produced his testimony which would have "elucidate[d] the transaction", the Court as factfinder may properly draw an adverse inference from their failure to call him. *United States v. Blakemore*, 489 F.2d 193, 195 (6th Cir.1973). *See also Mich. Standard Jury Instructions, 2nd,* § 6.01; *McCormick on Evidence,* § 272 (2nd ed. 1972).

4. Shaw was a police officer; he had a steady income and a prestigious job. Victor Cassar knew that yet took the position that he was so unreliable a tenant that immediate self-help eviction was necessary.

5. Alvarez considered Shaw and Moore desirable tenants; it was she who had handled rental of the apartment and received the security deposit. Victor Cassar neither consulted with nor informed her regarding the lock-out. *See* Appendix A. Frank Cassar had met Shaw personally and likewise thought him a desirable. He wanted to give Shaw an opportunity to demonstrate a mistake had been made with regard to his check, yet Victor Cassar, who had not met Shaw, "talked him out of it".

6. The irrationality of the decision to lock Shaw and Moore out of their apartment is aggravated by Victor Cassar's refusal to allow Shaw to demonstrate that a mistake had been made and that the check was good. As Victor Cassar explained himself at trial, "there was no way [he] would go to the bank" with Shaw.

The weight of the evidence supports the conclusion that defendants' actions were motivated at least in part by racial considerations. There is no credible explanation for defendants' extreme response to a rather routine problem in the rental housing business. Based on minimal evidence of financial irregularity, and contrary to all the other circumstances, Victor Cassar leapt to the conclusion that Shaw and Moore were such irresponsible tenants that an illegal lock-out was necessary to protect de-

fendants and that no offer on Shaw's part to correct the situation was acceptable. *Furnco, supra,* recognizes that people do not act in an arbitrary manner without underlying reasons, especially in a business setting; thus when legitimate reasons are absent, the finder of fact may properly assume that the decision was based on an impermissible factor such as race.[8] As suggested by Victor Cassar's comment to Shaw to the effect that he should not have gotten the apartment in the first place, I find that Victor Cassar harbored a racial bias; this bias was triggered by the problem with the checks into the extraordinary rage described by Alvarez that in turn led to the very unbusinesslike conduct of a very experienced businessman.

## VI. DAMAGES

■ Compensatory and punitive damages are appropriate in this case: compensatory damages because of the emotional stress, embarrassment and humiliation suffered by Shaw and Moore[9] and punitive damages because of the willful and wanton disregard of their rights. *Phiffer,* 648 F.2d at 553. The one thousand dollar limitation on punitive damages contained in 42 U.S.C. §3612(c) is not a ceiling as to plaintiffs' other claims. Section 1982 and the Fair Housing Act stand independently of each other. *McDonald,* 622 F.2d at 1234; *Miller v. Apartments and Homes of New Jersey, Inc.,* 646 F.2d 101, 110 (3rd Cir.1981).

■ In a bench trial the amount of damages involves a factual determination "left to the discretion and good judgment of the fact finder as guided by the facts of the particular case". *Smith v. Heath,* 691 F.2d 220 at 226. "No formula exists to determine with precision compensatory damages". *Id.* at 227. Likewise there is no formula to determine punitive damages.

■ Shaw and Moore's claims for compensatory damages were based on emotional distress, embarrassment and humiliation; out-of-pocket losses were minimal. These same items of damages were also suffered as a result of the violation of the Michigan anti-lockout law. I find that compensatory damages in the amount of $10,000 for Shaw are appropriate. I find that compensatory damages in the amount of $10,000 for Moore are appropriate.[10]

8. The decision of the Court of Appeals for this Circuit in *Harper, supra,* makes an instructive comparison to this case. In *Harper,* plaintiffs were also a black couple, both university students, who had initially been shown an apartment and given an application only to be told a week later that the apartment had been rented in the interim. There was no direct evidence of discriminatory intent and, as here, defendant had rented to black tenants in the past. Defendant offered as his reasons that he doubted plaintiffs' ability to pay the rent and considered them "lease breakers" because they had moved out of their prior housing before the end of the lease term. The record indicated that plaintiffs had sufficient income and credit to pay the rent and had supplied defendant with financial and credit information which he failed to check. As to the prior lease, plaintiffs' prior landlord had agreed to release them from the lease and defendant had agreed to rent to another person at about the same time who had said he could get out of his existing lease elsewhere. Defendant initially denied in his answer and on the stand that he had another apartment available when he denied plaintiffs' application but subsequently admitted that he did have another available.

The Court of Appeals found on the basis of the record taken as a whole that the district court had erred in finding that defendant refused to rent for legitimate business reasons, not because of race, and remanded for entry of judgment for plaintiffs.

9. *See Woods-Drake,* 667 F.2d at 1203:

"The record contains undisputed testimony by plaintiffs as to the embarrassment and humiliation they suffered, including strained relationships at work and among acquaintances, as a result of their eviction. Accordingly, the district court is instructed to award plaintiffs an amount which will fairly compensate them for this emotional distress."

10. *Cf. Phillips,* 685 F.2d at 191 (compensatory damages of $10,000 for each plaintiff for emotional distress); *Phiffer, supra* (affirming compensatory damages of $8,500 based primarily on humiliation and distress). *See also Bryant v. TRW, Inc.,* 487 F.Supp. 1234 (E.D.Mich.1980) *aff'd,* 689 F.2d 72 (6th Cir.1982), in which a jury verdict of $8,000 was held not excessive although the only actual damages for violation of the Fair Credit Reporting Act were embarrassment and humiliation.

As to punitive damages, the evidence shows that defendants are experienced landlords and operate a rather substantial business. The lock-out and refusal to allow Shaw to demonstrate that a mistake was made and that the two checks were good warrant an award of punitive damages in the amount of $5,000 to Shaw and $5,000 to Moore.[11]

### VII. CONCLUSION

#### A.

Plaintiffs introduced no direct evidence of discriminatory intent on the part of defendants; their case instead rests on inference from the events and surrounding circumstances. As Justice Powell explained in *Burdine,* intentional discrimination is often an "elusive factual question"; 450 U.S. at 255 n. 8, 101 S.Ct. at 1094 n. 8.

*McDonnell Douglas* and its progeny are a judicial response intended to prevent intentional discrimination from evading judicial scrutiny. Without reliance on circumstantial evidence, and the reasonable inferences arising from such evidence, many victims of discrimination would be denied relief.

"Overt and blatant discrimination is a relatively rare phenomenon .... It is intentional discrimination in its covert hidden form that now poses the real problem. Evidence of illicit intent may be extremely difficult to obtain, whether the responsible individuals are conscious of their bias, and therefore likely to try to hide it, or whether they are expressing unconscious bias through some discretionary decisionmaking process."

Bartholet, "Proof of Discriminatory Intent under Title VII: *United States Postal Service Board of Governors v. Aikens*", 70 *Cal. L.Rev.* 1201, 1203 (1982); *see also* Casenote, "Title VII—Employment Discrimination— Defendant's Burden of Proof in Rebutting Plaintiff's Prima Facie Case", 28 *Wayne*

L.Rev. 1477 (1982). I am satisfied that the evidence here sufficiently demonstrates that racial bias, conscious or perhaps unconscious, played a substantial role in defendants' treatment of plaintiffs in violation of the fair housing laws.

Shaw and Moore suffered substantially due to defendants' racially motivated actions. As recently stated by the Court of Appeals for this Circuit:

"Since 1866, when Congress sought to spell out the civil rights of the newly freed slaves, federal law has recognized the right to purchase and own a house as a fundamental part of American citizenship."

*McDonald,* 622 F.2d at 1232. For Shaw and Moore about to be wed, renting an apartment was the same as purchasing and owning a home. Shaw spent considerable time finding a lawyer to take his case, to attempt to right the wrong done him. As a police officer he particularly felt strongly about what defendants had done. He had every right to feel that way. Fortunately for defendants, Shaw and Moore recovered from the emotional trauma caused them. Fortunate also for them is my conclusion that the relatively modest award of punitive damages is adequate to the purpose of such awards, that is to deter defendants from any further violations of the civil rights law. *Woods Drake,* 667 F.2d at 1203–1204.

#### B.

Accordingly, for the reasons stated, I find in favor of Shaw and in favor of Moore on the claims they have made in this case and award to each of them $10,000 in compensatory damages and $5,000 to each of them in punitive damages for a total award of $15,000 to each of them plus interest as provided by law. A judgment shall be entered in favor of each of them in that amount.[12]

---

11. *Cf. Phillips, supra,* (punitive damages of $100,000); *Miller,* 646 F.2d at 111 (punitive damages of $25,000). Punitive damages here are based solely on the Federal claims.

12. Any application for attorney fees shall be filed within thirty days. *See* 42 U.S.C. § 1988 and *Northcross v. Board of Education of the Memphis City Schools,* 611 F.2d 624 (6th Cir. 1979).

APPENDIX A

Dear Sir

Please Contact
MR Cassar - 8615010 / 862 8706

— Please Do Not

Disturb the Manager
About this Mattar,
I Didn't inform her
About Whats going on

V Cassar Exhibit "B"